Crystal G. **KICKLIGHTER,** Plaintiff,

v.

**EVANS COUNTY SCHOOL DISTRICT, Dewey Hulsey, Individually and in his Official Capacity as Principal of Claxton High School, and Durell Lynn, Individually and in his Official Capacity as Superintendent of Evans County Schools, Defendants.**

No. CV 696–153.

United States District Court,
S.D. Georgia,
Statesboro Division.

June 12, 1997.

James Bevard Rutledge, William Jarell Jones, III, Statesboro, GA, for Plaintiff.

Ronald W. Hallman, Hallman & Stewart, Claxton, GA, Thomas F. Richardson, Jon C. Wolfe, Chambless, Higdon & Carson, Macon, GA, for Defendants.

## ORDER

EDENFIELD, District Judge.

This 42 U.S.C. § 1983 action attempts to make a "federal case" out of what is, at bottom, an in-school disciplinary matter. Before the Court are the parties' cross-motions for summary judgment. While the litigants have cluttered the record with numerous (and voluminous) non-material details, the basic facts are undisputed. See Fed.R.Civ.P. 56(c).

### I. *Background*

Plaintiff Crystal G. Kicklighter, a white female, was born in 1978. C. Kicklighter Dep. (doc. # 32) at 7. In June 1994, prior to starting the tenth grade at Claxton High School, Kicklighter became pregnant by Eugene Burney, a young black man she had been dating for two years. *Id.* at 8, 21, 40. By the time school opened on 8/29/94, school officials knew of her pregnancy. *Id.* at 42. Indeed, when Kicklighter went to pick up her class schedule that first day, a secretary suggested that given her "condition," she should consider enrolling at an "alternative school" geared, in Plaintiff's words, for "reform students." Doc. # 32 at 45, 48–49; *see also* Hulsey Dep. (doc. # 26) at 60.[1]

Two days later, Kicklighter got into an inappropriate "exchange of words" with another student before her English class had been called to order. Doc. # 32 at 51–54.[2] Overhearing the discussion, the teacher, Louise Jones, informed Kicklighter that she would not abide any off-color remarks in the classroom. Doc. # 32 at 52; Jones Dep. (doc. # 46) at 16. Plaintiff's retort included an invitation to "check the Declaration of Independence" with respect to free speech rights. Doc. # 32 at 54–56; doc. # 46 at 17–18. Jones then asked Kicklighter to find a seat, but when Plaintiff could not locate one, the teacher sent her to see Defendant Dewey

Hulsey, the principal. Doc. # 32 at 57–58; doc. # 46 at 17.

Hulsey directed Kicklighter to return the following day with a parent, which she did. Doc. # 32 at 64–65, 78. At that 9/1/95 conference—which Jones did not attend—Hulsey disciplined Kicklighter by ordering her to issue an apology "in front of the whole class." Doc. # 32 at 65–66; doc. # 25 at 40–41; doc. # 26 at 127, 132, 135. In addition, he imposed a five-day suspension, to be served either in school or at home. Doc. # 32 at 66, 71; doc. # 25 at 40–41; doc. # 26 at 136.

Yet, Plaintiff understood Hulsey to have given her the option of either serving a suspension or communicating an apology. Doc. # 32 at 79–80 ("I didn't gather that I would have to do two things to get back in school"). On 9/13/94, Plaintiff called the Evans County School District superintendent, Defendant Durrell Lynn, hoping that he "could help me in the matter and hear me out," but he declined to get involved at that time. Doc. # 32 at 86–87; *but see* doc. # 25 (Lynn) at 37–38, 39–40, 72 (remarking that he scheduled an appointment to meet with Kicklighter on 9/14/94, but she failed to appear). Plaintiff ultimately remained home for five days (and then some), and when she returned to school on 9/15/94, she thought the incident was well behind her. Doc. # 32 at 79–80, 85, 96 ("I figured that I could just go back to school. I had done my time").

However, upon her arrival, Hulsey informed Plaintiff that she could not attend class until she spoke with Lynn. Id. at 99–100; doc. # 26 at 158; Complaint (doc. # 1) Exh. C. Feeling that she neither had to apologize nor see the superintendent, and aware that she was openly flouting Hulsey's "directive," Kicklighter proceeded to homeroom. Doc. # 32 at 101. Ten minutes later, the principal and two policemen arrived at the classroom. *Id.* at 102–03; doc. # 37 (Todd Aff.) ¶¶ 2–3. Hulsey "motioned for

---

1. In fact, the alternative school was conceived to address "drop out prevention" and to serve "chronically disruptive" students. Clark Dep. (doc. # 41) at 8–9; Lynn Dep. (doc. # 25) at 54. It targeted "anyone who had been expelled, anyone who had dropped out of school, anyone who was presently in school but having disciplinary problems, [and] anyone who was in school who was having failure problems or attendance problems." Doc. # 41 at 11, 13.

2. Another student, Quincey Melvin, purportedly told Plaintiff, "Sit your pregnant ass down," whereupon she replied, "You just mad because you ain't got nobody pregnant." Doc. # 32 at 52; Milton Dep. (doc. # 38) at 8–9, 17.

[Kicklighter] to come here," but when she refused, the officers entered and escorted her from the room. Doc. # 32 at 103–05; doc. # 26 at 55, 111, 159–60; doc. # 37 (Todd Aff.) ¶ 3. As they guided her down the hall, Kicklighter announced that Hulsey "don't want me in here ... because I'm pregnant by a black boy"; the principal responded by telling the officers to arrest her for trespassing if she returned to school. Doc. # 32 at 105, 108; doc. # 26 at 162–63; doc. # 37 (Todd Aff.) ¶ 4.

Hulsey subsequently wrote to Plaintiff's parents and recommended that they schedule an appointment with Lynn. Doc. # 32 at 112. A few days later, the superintendent met with Kicklighter, her parents, and Bette Clark, the alternative school's director. Id. at 112–14; doc. # 25 at 41–42; doc. # 41 at 12. Lynn suggested that Plaintiff consider attending the alternative school in contemplation of her inevitable future absences, see supra note 1, but Kicklighter took this to mean that even if she apologized to the class—which she now was willing to do—she could not return to Claxton High. Doc. # 32 at 116–121.

Kicklighter stayed out of school altogether for the next two months. Id. at 121. In response to a letter authored by Plaintiff's counsel to Lynn, the school district made its position abundantly clear on 12/5/94: " ... [Crystal] may return to school at any time, provided that she does not again conduct herself in rude and disruptive manner. Mr. Hulsey has requested, and continues to request, that Crystal apologize to Mrs. Jones and the class for the disruptive behavior." Id. Exh. 1; doc. # 26 (Hulsey) at 135 ("As many days as it took, she was going to apologize to enter school again"). Kicklighter read the letter and properly gathered that the sole condition for her return was a mere expression of contrition. Doc. # 32 at 129

(Q: "Did you understand after reviewing this letter that you could return to school if you made an apology?" A: "Yes." Q: "And that there were not other conditions attached to your returning to school, other than making an apology?" A: "Right."). However, by this time, Kicklighter refused to apologize because "everything" had just gone "too far." Doc. # 32 at 130, 131 ("I just felt like an apology was too much after all that"). Rather than comply with this demand, Plaintiff sat out the entire 1994–95 academic year. Id. at 130–31 & Exh. 1; doc. # 25 at 41, 59, 87.

By the start of the next school year, Hulsey had retired and Lynn told Plaintiff that he was willing to "clean the slate": he dropped the apology requirement and allowed her to resume her education. Doc. # 32 at 134–35; doc. # 25 at 90; doc. # 37 Exh. B. Kicklighter stayed in school about a month and half, but she soon dropped out, claiming that she "couldn't take" people talking and pointing at her. Doc. # 32 at 135, 137–38. Since departing, she has made no effort to return to Claxton High or any other learning institution. Id. at 140.

At no time did Kicklighter challenge the school's actions or her punishment by availing herself of appropriate administrative avenues.[3] Although she desired a hearing in front of the "School Board," she never pursued that course of action once Lynn told her, "Well, you can, but chances are it's going to be [futile]." Doc. # 32 at 117; J. Kicklighter Dep. (doc. # 34) at 40 ("he basically said it probably wouldn't do no good anyway").

Instead, Kicklighter instituted this § 1983 action, alleging that Defendants violated her (i) First Amendment freedom of association, as they mistreated her on account of her relationship with Burney;[4] (ii) Fourteenth

3. At deposition, Lynn testified that he would typically review a principal's disciplinary measure only "[i]n the event the student disagreed with the punishment" and "the principal had exhausted everything that [he] could do in trying to work the situation out." Doc. # 25 at 59. If the superintendent supported the principal and the student remained dissatisfied, the pupil could seek a hearing before a "tribunal" or the local Board of Education. Id. at 26–27, 59, 82, 84, 87;

doc. # 26 at 144. Even then, the State Board of Education provided the next route for redress. Doc. # 25 at 27.

4. Kicklighter insists that Defendants long adhered to a "policy, custom and usage" of discouraging interracial mingling. To this end, she cites to several instances when various Claxton High personnel allegedly exhibited racial animus to her and others. See, e.g., doc. # 32 at 21–22,

Amendment right of equal protection by unlawfully discriminating on the basis of Burney's race, her gender and her pregnant condition; (iii) First Amendment right against compelled speech, by demanding that she make an apology to Jones and the class; and (iv) Fourteenth Amendment procedural due process rights, by repeatedly failing to comply with internal disciplinary procedures.[5] Seeking dismissal of this matter, Defendants have filed a motion for summary judgment. Plaintiff has similarly moved, but only on the issues of "compelled speech" and "predeprivation procedural due process."

## II. *Analysis*

This Court applies the summary judgment principles exhaustively detailed in *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112 (11th Cir.1993) and *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742–43 (11th Cir.1996).

### A. Substantive Due Process

■ As discussed *supra* note 5, Kicklighter alleges that by imposing a five-day suspension and coupling it with a demand for an apology, Defendants violated her rights to substantive due process. See doc. # ¶ 67. This contention is without merit.

■ The substantive component of the Due Process Clause protects only those rights that are "fundamental," that is, rights contemplated by the federal Constitution as "implicit in the concept of ordered liberty."

28–29, 33–39 (relating, for instance, that Hulsey disapproved of her ties to Burney and told her, "If it was up to me I'd put all the black people on a ship and send them back to Africa").

While Evans County School officials continue to grapple with the vestiges of a once-segregated system of public education, *see* doc. # 25 at 46–50 (conceding that as late as the mid–1990s, Claxton High School's student government employed a "dual system"); doc. # 26 at 69–70 (same); doc. # 37 Exh. A, the competent record evidence fails to show that the local Board of Education promulgated and followed any official rule or policy forbidding or discouraging dating among persons of different races. Doc. # 25 at 33, 36; doc. # 26 at 35–37. Claxton High did prohibit students from holding hands or otherwise displaying affection publicly, but this rule knew no racial bounds. Doc. # 26 at 37.

Even if the record did credit Plaintiff's version of events—and it does not—she has not suffi-

*McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir.1994) (en banc), *cert. denied*, 513 U.S. 1110, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995) (citation omitted). The "right" to attend a public school does not fall into this category; rather, it is a "state-created" right, *C.B. By and Through Breeding v. Driscoll*, 82 F.3d 383, 387 (11th Cir.1996), which "may be rescinded so long as the elements of procedural—not substantive—due process are observed." *McKinney*, 20 F.3d at 1556.

In *C.B., supra*, a high school student sued his principal, the superintendent, and the school district under § 1983 for constitutional injuries allegedly suffered when defendants suspended him from school. In discussing the *"exceedingly limited rights of public school students facing school discipline," id.* at 385 (emphasis added), the Eleventh Circuit held that the student's "effort to invoke substantive due process fails," since "the 'right' to avoid school suspension may be abridged as long as proper procedural protections are afforded." *Id.* at 387; *see also DeKalb Stone, Inc. v. County of DeKalb, Ga.*, 106 F.3d 956, 960 (11th Cir.1997); *North Fla. Educ. Development Corp. v. Woodham*, 942 F.Supp. 542, 549 (N.D.Fla.1996). Because the same may be said here, Defendants are entitled to summary judgment on the issue of substantive due process.

### B. Procedural Due Process

According to Plaintiff, Defendants contravened her procedural due process rights in a

ciently demonstrated that the punishment for her obstreperous conduct was, as she maintains (*see* doc. # 59 at 15–16), mere pretext for intentional discrimination on the basis of race. *See Nevares v. San Marcos Consol. Ind. Sch. Dist.*, 111 F.3d 25, 26–27 (5th Cir.1997) ("Today it is generally recognized that students are being deprived of their education by lack of discipline in the schools. Not only does disorder interfere with learning school studies, it also defeats the charge to inculcate the habits and manners of civility") (internal quotes omitted). Hence, the Court regards her bald assertions on this score as a groundless red herring.

5. Whereas Counts V and VI of the Complaint allege procedural due process violations, Count IV asserts an unspecified "due process" claim for the imposition of "arbitrary and capricious" punishment. The Court reads Count IV to raise substantive and procedural due process concerns.

variety of ways. For example, she insists that Hulsey disciplined her "without sufficient notice that a five-day suspension could result from a first referral for non-violent, overt disobedience," and that in so doing, he "deprived her of the opportunity to have the accusing teacher present for the conference." Doc. # 1 ¶ 70. For the reasons set forth below, the Court need not delve substantively into contentions of this sort.

■ The Fourteenth Amendment's Due Process Clause generally guards against the deprivation of life, liberty, or property without notice and an opportunity to be heard. *See Zinermon v. Burch,* 494 U.S. 113, 125–26, 110 S.Ct. 975, 983–84, 108 L.Ed.2d 100 (1990). Of course, "[i]n assessing a claim based on an alleged denial of procedural due process[,] a court must first decide whether the complaining party has been deprived of a constitutionally protected liberty or property interest. Absent such a deprivation, there can be no denial of due process." *Morley's Auto Body, Inc. v. Hunter,* 70 F.3d 1209, 1212 (11th Cir.1995) (citation and quotes omitted); *see also Merritt v. Brantley,* 936 F.Supp. 988, 990–991 (S.D.Ga.1996). For present purposes, the Court will assume that Kicklighter has a cognizable interest. *See Goss v. Lopez,* 419 U.S. 565, 576, 95 S.Ct. 729, 737, 42 L.Ed.2d 725 (1975).

■ Nevertheless, a procedural due process violation is not *complete* unless and until "the state refuses to provide a process sufficient to remedy the procedural deprivation. . . ." *McKinney,* 20 F.3d at 1557.[6] In other words, the deprivation of a state-created interest cannot sustain a procedural due process claim if the plaintiff bypassed viable state avenues that could have adequately cured even the most egregious of procedural defects.[7] *See Harris v. Board of Educ. of the City of Atlanta,* 105 F.3d 591, 596 (11th Cir.1997); *Stephenson,* 110 F.3d at 1312–13; *Merritt,* 936 F.Supp. at 992. This is the petard by which Plaintiff is now hoist.

■ Kicklighter readily admits that she did not resort to otherwise available means of redress. See doc. # 32 at 117; doc. # 34 at 40. Although Lynn may have significantly dampened her zeal for her prospects with further review, he did not bar her outright from pursuing appellate access. Nor has Plaintiff cited to authority demonstrating, as she suggests (*see, e.g.,* doc. # 1 ¶¶ 35–36, 45, 54, 71), that he was obligated to exhort her to proceed with an appeal.

In fact, Plaintiff's complaint omits any allegations concerning the *inadequacy* of available state procedures. *See McKinney,* 20 F.3d at 1563 n. 18; *Merritt,* 936 F.Supp. at 991. While she avers that she was "denied any notice of any further rights of review

6. Plaintiff submits that because *McKinney* arose in a public employee context, it is inapplicable to the case *sub judice.* However, there is pertinent authority suggesting that *McKinney* principles extend into the sphere of public education. *See C.B.,* 82 F.3d at 387 n.3 (observing that principal's alleged bias "amounts to no deprivation of procedural due process," and noting that *McKinney* presented "an analogous situation"); *Stephenson v. Davenport Comm. Sch. Dist.,* 110 F.3d 1303, 1312–13 (8th Cir.1997) (refusing to examine merits of procedural due process claim where student "failed to exhaust her state remedies") (citing *Zinermon,* 494 U.S. at 125–26, 110 S.Ct. at 983–84).

Kicklighter places much stock in the fact that the C.B. panel addressed the student's procedural due process claim on the merits. See doc. # 22 at 24–25. Nevertheless, this Court does not read C.B. as foreclosing a *McKinney* analysis here. *See Stephenson,* 110 F.3d at 1312–13. It is possible, for instance, that the defendants in C.B. either failed to raise *McKinney* "waiver," *see Merritt,* 936 F.Supp. at 993, or else opted to

prove that the student there received all the process he was due.

In any event, the crux of the distinction Kicklighter aims to draw—that "[g]overnment employees simply do not have the same due process rights to substantial predeprivation process as students do," doc. # 22 at 23–24—is unsubstantiated by the case law. *Compare Narey v. Dean,* 32 F.3d 1521, 1527 (11th Cir.1994) (where public employee has legally protectable property interest in his employment, he is entitled to notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story prior to any adverse job action); *with Goss,* 419 U.S. at 576–82, 95 S.Ct. at 737–40 (student with legally protectable liberty and property interest is entitled to notice of the charges, an explanation of the evidence, and an opportunity to present his side of the story before a short-term suspension is imposed).

7. An "adequate" remedy is one that fully compensates a plaintiff for the liberty or property loss suffered. *McKinney,* 20 F.3d at 1564 (citation omitted).

beyond the meeting with Superintendent Lynn," doc. # 1 ¶ 45, Kicklighter falls short of pleading, much less *proving,* that the state refused to provide her with a sufficient post-deprivation remedy. *McKinney,* 20 F.3d at 1564 ("The fact that [plaintiff] failed to avail himself of the full procedures provided by state law ... does not constitute a sign of their inadequacy") (internal quotes omitted); *Merritt,* 936 F.Supp. at 991 (noting that plaintiff must "plead and prove" inadequate state remedies in order to state a procedural due process claim).

Hence, hindsight reveals that Plaintiff erroneously eschewed the opportunity to cure the procedural defects of which she now complains. *See Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 273, 108 S.Ct. 562, 571, 98 L.Ed.2d 592 (1988) ("the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local officials, *and not of federal judges"*) (emphasis added). Because Kicklighter never suffered a deprivation of procedural due process sufficient to sustain a § 1983 claim, summary judgment on this point must be granted to Defendants.

■ In an effort to create a legal issue where there is none, Kicklighter insists that Defendants impermissibly suspended her for more than 10 days and/or expelled her by blocking her return until she agreed to deliver an apology to her class. *See Goss,* 419 U.S. at 576, 95 S.Ct. at 737 ("A 10–day suspension from school is not *de minimis* in our view and may not be imposed in complete disregard of the Due Process Clause. A short suspension is, of course, a far milder deprivation than expulsion"). Plaintiff would stand a far better chance of prevailing on this argument if the record did not so clearly indicate that she voluntarily remained out of school for a year. *See, e.g.,* doc. # 25 (Lynn) at 97–98 (noting that Kicklighter had the status of "voluntary dropout" or "withdrawn" student). For this reason, the procedural safeguards delineated in *Goss* are not implicated, and Kicklighter's motion for summary judgment must be denied.

Hulsey's punitive measures involved only a five-day suspension and an apology requirement; sheer assertions and individual choices on Plaintiff's part do not recast them into something more. Even if she initially misunderstood the terms of this punishment—and they did not seem all that complicated—Kicklighter could have sought clarification from Hulsey upon returning to school on 9/15/94. Instead, she sauntered off to class that day after encountering and crossing the principal, thereby precipitating her almost immediate removal. Not long thereafter, she recognized—and the parties do not dispute—that at all times, she controlled whether she would resume her education: all she had to do was apologize. However, deciding that things had progressed "too far" and that she had endured "too much," Kicklighter wrapped herself in the flag and refused to utter words in which she did not believe. See doc. # 19 at 8–9. In short, Plaintiff was loath to forfeit, as she understands them, her First Amendment rights against compelled speech. It is to that issue the Court now turns.

## C. First Amendment: "Compelled Speech"

Kicklighter offers a flawed syllogism to support her position that "[t]he First Amendment shields the student's mind and thought from intrusion by the school master." Doc. # 19 at 6. Beginning with this sweepingly broad pronouncement—and ignoring the fact that an educator's usual objective is to penetrate a student's mind—Plaintiff notes that "to apologize" is to be "sorry," which itself entails a "feeling" of "sympathy, pity or regret." *Id.* at 8. Because "feeling sorry is a purely personal belief," it is "a matter of individual thought and mind" protected by the First Amendment. *Id.; see also West Virginia Bd. of Educ. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, *or other matters of opinion* .... If there are any exceptions which permit an exception, they do not now occur to us") (emphasis added). With the introduction of another well-settled notion into the mix—that is, that "[t]he right of freedom of thought ...

against state action includes both the right to speak freely *and the right to refrain from speaking at all," Wooley v. Maynard,* 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977) (emphasis added); *see also Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston,* 515 U.S. 557, 573, 115 S.Ct. 2338, 2347, 132 L.Ed.2d 487 (1995) ("the principle of free speech is that one who chooses to speak may also decide 'what not to say' ")—Plaintiff argues for summary judgment. Yet, in so doing, she turns a blind eye both to controlling precedent that undercuts her position and the facts of the instant case.

■ While students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," the Supreme Court has long recognized that consistent with fundamental safeguards, state and school officials possess "the comprehensive authority ... *to prescribe and control conduct in the schools." Tinker v. Des Moines Ind. Comm. Sch. Dist.,* 393 U.S. 503, 506–07, 89 S.Ct. 733, 736–37, 21 L.Ed.2d 731 (1969) (emphasis added); *see also Board of Educ. v. Pico,* 457 U.S. 853, 864–865, 102 S.Ct. 2799, 2806–07, 73 L.Ed.2d 435 (1982). Indeed, the First Amendment "guarantees wide freedom in matters of adult public discourse," but it does not follow that "the same latitude must be permitted to children in public school." *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549, (1986); *see also New Jersey v. T.L.O.,* 469 U.S. 325, 339, 105 S.Ct. 733, 741–42, 83 L.Ed.2d 720 (1985) ("the preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult"). Put simply, "the constitutional rights of students in the public school are not automatically coextensive with the rights of adults in other settings." *Id.; Pico,* 457 U.S. at 866 (" 'First Amendment rights, applied in light of the special characteristics of the school environment, are available ... to students ' ") (citation omitted). This is what the Eleventh Circuit meant when it recently referenced the "exceedingly limited rights of public school students facing school discipline." *C.B.,* 82 F.3d at 385.

Public high schools have a "legitimate and substantial interest in promoting respect for authority and traditional values be they social, moral or political." *Pico,* 457 U.S. at 864; *see also* doc. # 19 (Plaintiff's brf.) at 13 ("the State has a legitimate interest in maintaining student discipline"). The mission of any school is to impart varied lessons contributing to a student's well-rounded edification. *See Brown v. Board of Educ.,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954) (education "is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment"); doc. # 26 (Hulsey) at 134 ("We are teaching children not just reading and writing. We are teaching them respect as well"). Where appropriate, these lessons sometimes take the form of disciplinary measures, even if at the time they are imposed, the student does not fully appreciate their educational purpose. Not even twenty years old, Kicklighter suffers from this kind of short-sighted immaturity.

■ In glibly remarking that "[t]his case is not about the value of the apology," doc. # 53 at 1, Plaintiff fails to realize that to require a simple apology for truculent and disruptive in-school behavior falls well within the ambit of an institution's balanced "comprehensive authority." *See Tinker,* 393 U.S. at 507–09, 89 S.Ct. at 736–38. If the "school board" can determine "what manner of speech" is inappropriate in the classroom, *Bethel,* 478 U.S. at 683, 106 S.Ct. at 3164, it can also dictate what speech is proper when fulfilling its "charge to inculcate the habits and manners of civility," *Nevares,* 111 F.3d at 27, especially where the prescribed utterance does not touch upon the student's other protected freedoms.

Plaintiff's case hardly presents one of those rare instances when federal courts should "intervene in the resolution of conflicts which arise in the daily operation of school systems." *Pico,* 457 U.S. at 864, 102 S.Ct. at 2806; *see also Hazelwood,* 484 U.S. at 273, 108 S.Ct. at 571; *Searcey v. Harris,* 888 F.2d 1314, 1319 (11th Cir.1989) ("a court must defer to reasonable educational decisions made by educators"). Because Kick-

lighter fails here in her strained attempts to elevate rudimentary concepts to a level of constitutional import, summary judgment will be entered in favor of Defendants.

### D. First Amendment: Freedom of Association

█ Plaintiff maintains that Defendants impinged on her First Amendment associational rights by "retaliating" against her on account of her intimate relationship with Burney, a black male. *Inter alia,* she claims that: school officials discouraged her from attending "regular daytime school" and steered her toward the alternative school; Hulsey's apology requirement constituted excessive punishment in the form of "forced public humiliation"; and Lynn treated her "in a condescending and humiliating manner" when he conferred with her on 9/21/94. Doc. # 1 ¶ 54. Wholly lacking evidentiary support, her allegations fail as a matter of law.

█ In the Eleventh Circuit, "dating" is associational activity protected by the First Amendment. *Wilson v. Taylor,* 733 F.2d 1539, 1544 (11th Cir.1984). With the objective of proving Defendants' "improper motive and pretext," Kicklighter draws on Title VII principles. *See* doc. # 59 at 20 n. 2; *Combs v. Plantation Patterns,* 106 F.3d 1519 (11th Cir.1997) (reviewing current Title VII standards in light of recent developments). Assuming (without deciding) that Plaintiff has framed the inquiry properly, she fails to point to sufficient evidence allowing the Court to disbelieve the reasons given by Defendants for their actions. *See Benson v. Tocco, Inc.,* 113 F.3d 1203, 1207 (11th Cir. 1997); *Combs,* 106 F.3d at 1532.

Kicklighter cannot, for example, establish that Hulsey disciplined her with a short-term suspension and apology for anything other than her unruly and puerile in-school conduct. It was she, not he, who mentioned Burney in anger as the two officers led her away from class on 9/15/94. Similarly, no matter how deeply offended Plaintiff was by suggestions (from Lynn and a Claxton High secretary) that she consider attending the alternative school, the record is devoid of evidence showing that this "condescending" and "humiliating" treatment—if it can be

termed as such—was prompted by disapproval of her associational ties to Burney, and not by the substantial likelihood that she would miss numerous future school days for reasons related to her pregnancy. *See supra* note 1. As Plaintiff is incapable of producing the "affirmative evidence" necessary to defeat Defendants' properly supported motion, *see Anderson v. City of Glenwood, Ga.,* 893 F.Supp. 1086, 1087 (S.D.Ga.1995), summary judgment is appropriate.

### E. Equal Protection

█ Kicklighter further contends that Defendants violated her Fourteenth Amendment right to equal protection by unlawfully discriminating on the basis of her gender, her pregnancy, "the race of her companions and friends, and her status as a pregnant woman carrying a mixed-race fetus." Doc. # 1 ¶ 58. To this end, she claims that school officials "treated her differently than similarly situated non-pregnant students." *Id.* ¶ 59.

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3253–54, 87 L.Ed.2d 313 (1985); *Marshall County Bd. of Educ. v. Marshall County Gas Dist.,* 992 F.2d 1171, 1177 (11th Cir.1993). "Thus, the first step in an equal protection case is determining whether the plaintiff has demonstrated that she was treated differently than others who were similarly situated to her." *Klinger v. Department of Corrections,* 31 F.3d 727, 731 (8th Cir.1994), *cert. denied,* 513 U.S. 1185, 115 S.Ct. 1177, 130 L.Ed.2d 1130 (1995). Failing to direct "this Court's attention to any factual support for such a finding," *Novak v. Cobb County–Kennestone Hosp. Auth.,* 849 F.Supp. 1559, 1572 (N.D.Ga.1994), Kicklighter cannot surmount this primary hurdle. Because she has neglected to show, for instance, that Defendants treated her differently than other pregnant students who misbehaved and then refused to accept full responsibility for their actions, or differently than other pregnant students carrying "mixed-race fetuses," Plaintiff is unable to withstand summary judgment.

### III. *Conclusion*

Accordingly, Defendants' motion for summary judgment (doc. 15) is **GRANTED**, Plaintiff Crystal G. Kicklighter's motions for summary judgment (docs. #18 & 21) are **DENIED**, and her Complaint is **DISMISSED WITH PREJUDICE**. Having disposed of Plaintiff's claims on the merits, the Court does not reach Defendants' contentions regarding qualified immunity.