Casey Gold RIGGAN, Plaintiff,

v.

MIDLAND INDEPENDENT SCHOOL DISTRICT, Neil Richmond, Individually and as Principal of Midland Senior High School, The Midland Independent School Board, Martha Manulik, George Lara, Glen Bufler, Shane Boring, Patricia Hodges, James Fuller, Becky Oekerman, Joe Cummins, Jimmie Kelly, and Joseph Baressi, Defendants.

No. MO–99–CA–66.

United States District Court,
W.D. Texas,
Midland–Odessa Division.

Feb. 23, 2000.

Brian Carney, Midland, TX, for plaintiff.

Jack Q. Tidwell, Odessa, TX, Rick G. Strange, Midland, TX, for defendants.

## AMENDED ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

FURGESON, District Judge.

Before the Court are Defendants' Motion for Summary Judgment and Brief in Support, filed September 30, 1999; Plaintiff's Response to Defendants' Motion for Summary Judgment, filed October 25, 1999; and Defendants' Reply to Plaintiff's Response, filed November 1, 1999. After due consideration of the motions, briefs, record, and controlling law, the Court is of the opinion that the Defendants' Motion for Summary Judgment should be GRANTED IN PART and DENIED IN PART.

### ISSUES PRESENTED

The issues before the Court are as follows:

1. Is there subject matter jurisdiction over this school disciplinary action in light of allegations of constitutional violations?

2. Does Plaintiff, a high school senior in a public school at the time in question, have a protected property interest in his education sufficient to invoke Fourteenth Amendment Due Process protection that was implicated by the punishment imposed in this case, which was a three day suspension, five days of Alternate Education, two

letters of apology, and exclusion from graduation ceremonies?

3. If so, did he allege or produce evidence raising a genuine issue of material fact that his Fourteenth Amendment due process rights were violated, or in other words, did the Defendants' grievance procedures satisfy the minimum Due Process requirements of oral or written notice of the charges against him, an explanation of the evidence against him, and the opportunity to present his side of the story?

4. Is there a genuine issue of material fact as to whether the Defendants' actions in disciplining Plaintiff were arbitrary, capricious, or wholly unrelated to the legitimate state goal of maintaining an atmosphere conducive to learning sufficient to constitute a violation of Plaintiff's Substantive Due Process Rights?

5. Has the Plaintiff asserted a colorable claim that his Fifth Amendment rights were violated by the requirement that he write two letters of apology when the original punishment under school policies mandated a referral to local law enforcement?

6. Has the Plaintiff raised a genuine issue of material fact as to whether his punishment, imposed, in part for taking or possessing a picture of his principal's car on a public street, violated Plaintiff's First Amendment rights?

7. Has Plaintiff raised a genuine issue of material fact as to whether the Defendants' "settlement offer" could be considered an attempt to intimidate a federal court witness or litigant sufficient to avoid summary judgment on his conspiracy claims?

8. Are there remedies available under Plaintiff's state constitutional claims, or is that claim barred because of the lack of monetary remedies?

9. Finally, are Defendants entitled to qualified immunity for the disciplinary actions undertaken in their official capacity?

## BACKGROUND

Casey Gold Riggan, the Plaintiff in this action, was an 18 year old high school senior at Midland Senior High School in the Midland Independent School District (MISD) when this cause of action arose. During the time in question, the Spring semester of 1999, Neil Richmond, the Principal at Midland Senior High School, was under investigation for alleged sexual improprieties as a result in part of various rumors concerning photographs or videotapes. This investigation was initiated when a local newspaper claimed to have an intimate videotape of Richmond (sometimes referred to as "the Principal"). Although this videotape was never produced and presumably does not exist, Dr. Joseph Baressi, Superintendent of MISD ordered Jimmie Kelly, the Director of Compliance and Administrative Services for MISD to commence an investigation into Richmond's extra-curricular activities.

The newspaper gave the name "Cody Owens" as their source of the videotape and other information; however there is no student by that name in any MISD school. Through other sources, the administrators learned that Riggan may have had information and some pictures relating to the rumors about Richmond. Jimmie Kelly therefore pulled Riggan from classes to interview him about the matter.

Riggan admitted that previously he and two of his friends had seen Richmond while out at a local restaurant and that they had decided to follow the Principal afterwards as he drove to a teacher's house. When Richmond parked his suburban in front of the teacher's house, Riggan handed a camera to one of his friends and the friend took two pictures of the car parked on a public street. Riggan had possession of the pictures, but he never brought the pictures to school and denied starting any rumor about Richmond's alleged sexual misconduct. In fact, he claimed it was the rumors already circulating about Richmond that inspired the boys to take the pictures in the first place as a

prank.. Riggan further denied calling the newspaper with any information or false stories of a videotape; he only later called to clarify that he was not the "Cody Owens" they referenced.

Once Richmond became aware that Riggan had possession of these pictures, he sought out the other two students who were with Riggan and had actually taken the pictures. He took one of the students, an athlete, aside during baseball practice and interrogated him in the Principal's suburban. The student admitted taking the picture and not surprisingly expressed repentance. He was apparently told that he would not be punished and was allowed to leave the suburban to return to baseball practice. Richmond claims the second student also expressed repentance in remarkably similar words and was also not punished. Although both students apparently promised Richmond a written statement indicating that the picture-taking incident was entirely Riggan's idea, neither student produced such a statement.

The Principal was not so lenient with Riggan. He called Riggan and his father, Tim Riggan, into his office on April 19, 1999. In the record before the Court, there is a dispute about the content of the meeting. Richmond alleges that he informed the Riggans of a possible plot by Riggan to print one of the photographs on T-shirts over the caption "I never had sex with that woman." Apparently, according to rumor, the t-shirts would then be distributed at graduation ceremonies. Richmond also accused Riggan of starting or perpetuating the sexual misconduct rumors. Riggan specifically denies any intention to make or distribute the t-shirts and claims that this allegation was not made at any of the disciplinary hearings but was only raised after he filed his lawsuit. He further claims in his affidavit that Richmond only talked about the photographs of the suburban in his meetings with the Riggans. Although Richmond claims the meeting was simply to inform Riggan and his father about what the Principal had discovered and "get their side of the story," the meeting apparently turned heated and Richmond had Tim Riggan removed from his office.

Richmond claims in his deposition that he was not angry at Riggan at the time, despite the fact that the meeting was to deal with allegations that Riggan had allegedly started rumors about the Principal's own sexual misconduct. Instead, he claims that he felt relieved to get to the bottom of the rumors. Nonetheless, Richmond's initial impulse was to assign Riggan to the Alternative Education Program (AEP) for the balance of the school year, among other disciplinary actions for taking pictures of his car on a public street. The AEP is a program located away from the regular school campus, where students are separated from other students and their regular teachers and classes.

After the meeting, Richmond charged Riggan with retaliation as it is defined in the Texas Penal Code § 36.06, a Level III offense in the MISD handbook, and suspended Riggan for three days as part of his punishment. Level III offenses require a mandatory referral to Midland law enforcement. The Principal apparently decided that Riggan took the pictures on the public street as an act of retaliation for previous disciplinary incidents in which Riggan was asked to leave several Midland High School basketball games for wearing an inappropriate shirt and sneaking sodas into the game. After Riggan completed this suspension, Richmond held a second meeting with Tim Riggan to decide on the remainder of Riggan's punishment, which he considered a Level One hearing under the MISD grievance procedure. At this conference Richmond further required Riggan to attend five days in AEP "as a compromise." As the final element of Riggan's punishment, Richmond required Riggan to write two letters of apology or he would be banned from participating in the graduation ceremony.

Under the MISD grievance procedure, a Level One hearing is before the principal.

The principal then must issue a written decision within three days summarizing the grievance, stating his decision and the reasons therefor, and informing the student of the right to appeal. A written decision was never issued in this case.

Riggan exercised his right to a Level Two hearing. Level Two hearings in the grievance procedure are heard by an assistant superintendent who reviews the documents, evidence, and written decision from the Level One hearing. Both Richmond and Riggan had the right to present witnesses at this second hearing, the last chance for the two parties to submit new evidence in the grievance procedure. Again, the assistant superintendent is required to issue a written decision detailing his findings and reasons.

On April 26, 1999, Joe Cummins presided over the Level Two hearing, where Richmond continued to pursue punishment for Riggan as both principal and aggrieved party. He asserted at this time that he was in possession of statements from numerous students, teachers, and community members implicating Riggan as the source of any rumor against him. Cummins never requested to see the statements. They were not produced by Richmond. In fact, as shown by subsequent discovery, these statements were verbal statements from anonymous sources that Richmond had never reduced to writing. Cummins issued a decision on April 29, 1999 finding no evidence of retaliation as that crime is defined by the MISD handbook and Texas Penal Code, but instead charging Riggan with "disrespect to an adult." The decision did not detail the exact conduct that constituted the disrespect or further define the offense. Disrespect to an adult is a Level II offense, and Riggan's punishment was determined to be the three days of suspension that had already been served, five days assignment to AEP, probation for the balance of the semester, and two letters of apology.

Only at this point was Riggan's discipline taken away from Richmond and assigned to an assistant principal—Hernandez. This re-assignment was made because Richmond threatened civil action against Riggan and his parents during the Level Two hearing while he was pursuing Riggan's punishment in his role as principal. However, this was not the first time that Richmond had threatened legal action as a result of the rumors concerning him. The record shows that he had previously threatened legal action against three other adults in the school administration who allegedly had initiated and perpetuated rumors about his alleged sexual misconduct.

Riggan again exercised his right to appeal to the Board of Trustees in what is called a Level Three hearing. In this final stage in the school grievance process, the Board reviews the record from the first and second hearings to determine whether the charge and punishment are correct. No new evidence is to be presented at this hearing. Plaintiff contends, however, that one of the Board members, another of the Defendants in this case, Martha Manulik, conspired to defeat the appeal which was heard on May 11, 1999. It was allegedly her conspiratorial design to assist Richmond's retaliation against Riggan by introducing information outside of the record such as her personal belief that Riggan was "bad news." She also allegedly discussed conversations she had with Mrs. Richmond about the situation. There are further allegations that the Board violated the Open Meetings Act by refusing to open the meeting to the public, specifically excluding all the students who had come to speak on Riggan's behalf. In the end, the punishment was upheld.

After Riggan initiated the present action in federal court, the Board of Trustees met again and passed a motion noting that Riggan would only be allowed to participate in graduation ceremonies if he wrote the letters of apology or dropped the lawsuit. This motion was entitled a "settlement offer."

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), a summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In other words, the principal question before the Court in a motion for summary judgment is whether a genuine issue of material fact exists. *See* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, Civil 3d § 2725. In making this determination, the Court will construe all evidence in favor of the non-movant. *See* Wright, *supra* at § 2727.

The burden in a summary judgment motion is initially on the movant to demonstrate that no genuine issue of fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party shows this, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e); *see Meadowbriar Home For Children, Inc. v. Gunn*, 81 F.3d 521, 533 (5th Cir.1996). There is a genuine issue of fact when the evidence is such that a reasonable jury could find in favor of the non-moving party. *See Meadowbriar*, 81 F.3d at 533. If the non-movant is not able to sufficiently establish a fact issue on an element that it would have the burden of proof on at trial, the movant is entitled to summary judgment. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

## DISCUSSION

In their Motion for Summary Judgment, Defendants assert a right to judgment on the merits on all of the claims in Plaintiff's Complaint. Defendants also re-urge their objection to this Court's jurisdiction over what they consistently characterize as a mere school disciplinary action. Because this Court had previously reserved ruling on jurisdiction, the Court will address that issue first.

To assess the challenge to jurisdiction and the motion for summary judgment, the Court has before it the depositions of Neil Richmond, Joe Cummins, Jimmie Kelly, Martha Manulik, Patricia Hodges, and Joseph Baressi (Volumes 1 and 2). The Court also has the affidavit of Dr. Baressi with the Minutes of the MISD Board of Trustees' meeting on May 25, 1999 attached, a videotape recording of the Level II hearing, and the affidavit of Casey Riggan. Finally, the record additionally contains Exhibit 3 from the Cummins deposition, which includes a letter from Jimmie Kelly to Riggan's attorney denying postponement of the Level III hearing; a letter to Jimmie Kelly from Riggan's attorney requesting information; the Level III hearing notification of date and time; the Notice of Appeal of the Level II decision; the Level II written decision of April 29, 1999; the Level II notification of hearing date and time; the Notice of Level I complaint; copies of the photographs in dispute as submitted in the Level I hearing; and a copy of Riggan's student disciplinary record at Midland High School. This record has been established as a part of the limited discovery which the Court initially granted to the parties.

### A. Jurisdiction

Defendants assert that this Court lacks subject matter jurisdiction over Riggan's complaint because they characterize this dispute as a mere disciplinary matter that does not rise to constitutional dimensions. In support, Defendants draw the Court's attention to several cases in which no jurisdiction was found. However, because this Court finds that Plaintiff has asserted a colorable claim of a constitutional violation, jurisdiction is proper.

Merely because this lawsuit arises in the context of a school disciplinary action does not automatically deprive federal courts of the jurisdiction to review potential consti-

tutional violations. It is important to reiterate that students' constitutional rights do not end at the schoolhouse door. *See Tinker v. Des Moines School Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In this case, Plaintiff Casey Riggan has asserted claims for denial of his First Amendment Free Speech rights, as well as Procedural and Substantive Fourteenth Amendment Due Process rights. While "it is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion," it is the role of federal courts to decide claims of constitutional violation. *Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (denying jurisdiction after finding the dispute did not rise to the level of a violation of specific constitutional guarantees). If Riggan's claims amounted to no more than an attempt to "relitigate in federal court evidentiary questions arising in school disciplinary proceedings" this Court would decline jurisdiction. However, as stated above and discussed below, Riggan has asserted constitutional claims sufficient to survive a Summary Judgment and thereby invoke this Court's jurisdiction.

### B. Procedural Due Process

### 1. Whether Due Process Protections Apply: Protected Property Interests

■ The Due Process Clause prevents the state from depriving a person of life, liberty, or property without due process of law. Protected property rights are created by sources such as state statutes entitling citizens to certain benefits. *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In the seminal case outlining the due process rights of students in public school disciplinary proceedings, the Supreme Court in *Goss v. Lopez* found that students had a protected property interest in education that required minimum due process protections before disciplinary suspensions could be imposed. *See* 419 U.S. 565, 573, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). The

Supreme Court held that the students had a property interest in education based on state laws providing free education to all children between the ages of five and 21 years and compelling attendance for a school year of not less than 32 weeks. *See id.* at 573. Texas has similar laws promising equal access to quality education for all Texas children, specifically entitling children between the ages of five and 21 years to the benefits of the available school fund and compelling attendance for the entire period of instruction. *See* TEX.EDUC.CODE ANN. §§ 4.001 (Public Education Mission and Objectives); § 25.001 (Admission); § 25.085 (Compulsory School Attendance) (Vernon 1987 & Supp.1995).

■ Under *Goss,* these State laws entitle Texas schoolchildren to a public education, and therefore students have a property interest in that education that cannot be taken away through disciplinary suspension or expulsions without due process of law. *See Goss,* 419 U.S. at 574, 95 S.Ct. 729. The question in this case is whether this property interest was implicated by the punishment imposed on Riggan of three days suspension, five days of AEP, exclusion from graduation ceremonies, and two letters of apology.

Defendants focus on Riggan's exclusion from graduation ceremonies and claim that Riggan was not deprived of any protected property interest (and therefore not entitled to due process protections) because there is no property interest in a graduation ceremony. Defendants rely on *Williams v. Austin Independent School District,* wherein Judge Sparks refused to grant a temporary restraining order to allow a student who had not completed his requirements for graduation to participate in graduation ceremonies. *See* 796 F.Supp. 251 (W.D.Tex. 1992). While the question of whether a student has a property interest in graduation ceremonies despite having failed to complete all academic requirements such as the Texas Assessment of Academic

Skills Examination is by no means settled, it is not strictly relevant to a disciplinary Due Process case. *See, e.g., Crump v. Gilmer Independent School District,* 797 F.Supp. 552, 554 (E.D.Tex. 1992) (coming to the opposite conclusion and implying a property interest in the graduation ceremony); Lisa L. Swem. *Due Process Rights in Student Disciplinary Matters,* 14 J.C. & U.L. 359, 361–62 (1987) (noting that due process rights vary depending on whether it is a disciplinary or academic action, and noting that courts tend to allow schools to establish academic requirements without the same level of judicial intervention as in disciplinary matters). Furthermore, and more importantly, there is more at issue in this case than simply the exclusion of Casey Riggan from his graduation ceremony.

As a separate part of their argument for lack of jurisdiction, Defendants also claim that the reassignment to an Alternate Education Program does not deprive Riggan of a protected property right and therefore once again does not implicate due process rights. *See Zamora v. Pomeroy,* 639 F.2d 662 (10th Cir.1981). In *Zamora,* the Court found that temporary reassignment to an alternate school was not a constitutional injury and therefore did not invoke the Court's jurisdiction. *See id.* at 670. However, in reaching that conclusion, the Court first decided that the plaintiff's Due Process rights were met and satisfied. *See id.* at 668. The Court found that the plaintiff in that case was not deprived of an education, did not lose any benefits other than the right to play baseball, and was therefore assessed a punishment in harmony with the Constitution in light of the seriousness of his offense (possession of marijuana). *See id* at 670.

Similarly, in *Nevares v. San Marcos Consolidated Independent School District,* the Fifth Circuit held that there is no protected property right implicated in the denial of a particular curriculum and therefore the transfer to another school for disciplinary purposes does not support

federal court jurisdiction. *See* 111 F.3d 25, 26–27 (5th Cir.1997). The Court found that a constitutional issue was not raised because the plaintiff was never denied access to public education. *See id.*

In sum, the case law reinforces the basic idea that protected property rights are affected and due process protections are required when the discipline imposed amounts to a deprivation of access to education. While the courts in the cases discussed above found that those plaintiffs were not denied access to education from their assignment to an alternate education program, the Plaintiff in the present case raises a genuine fact issue as to whether he was denied such access to education. Riggan's assignment to AEP occurred over the period of final review for exams. He alleges that the timing of the AEP assignment in fact significantly affected his educational opportunities because he was prohibited from participating in or benefiting from the comments of his teachers and peers during in-class reviews. When assignment to an alternate education program effectively acts as an exclusion from the educational process, due process rights may be implicated. *See Cole v. Newton Special Municipal Separate School District,* 676 F.Supp. 749, 752 (S.D.Miss.1987), *aff'd* 853 F.2d 924 (5th Cir.1988) (relying on *Goss v. Lopez* for the proposition that the exclusion from the educational process is the key issue before the Court). "The primary thrust of the educational process is classroom instruction;" therefore minimum due process procedures may be required if an exclusion from the classroom would effectively deprive the student of instruction or the opportunity to learn. *See Cole,* 676 F.Supp. at 752.

This Court need not decide whether the decision to send Riggan to AEP during final review was alone enough to implicate due process concerns, any more than it has to decide whether the exclusion from graduation ceremonies alone impacts protected property rights. The students in *Zamora* and *Nevares* were contesting an assign-

ment to AEP alone, whereas Riggan was assessed a more extensive punishment. For the purposes of this Due Process review, the entire punishment assessed against Riggan must be considered as a whole, not as separate elements. The entire punishment of three days suspension, five days assignment to AEP, and two letters of apology, is sufficient to implicate his protected property interests in education and invoke at least minimum Due Process protections, even though Riggan was not expelled and only suffered a relatively short suspension. "Neither the property interest in educational benefits temporarily denied nor the liberty interest in reputation, which is also implicated, is so insubstantial that suspensions may constitutionally be imposed by any procedure the school chooses, no matter how arbitrary." *Goss v. Lopez*, 419 U.S. 565, 576, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). This Court finds that Riggan has a protected property interest in education that was impacted by the punishment imposed, and will therefore examine whether Riggan's minimum due process rights were actually met by the grievance procedure followed in this case.

## 2. What Process is Due?

■ When a student is threatened with the exclusion from education through the assessment of suspension and other disciplinary punishments, he is entitled to oral or written notice of the charges against him, an explanation of the evidence against him, and the opportunity to present his side of the story. *See Goss v. Lopez*, 419 U.S. 565, 580, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). This opportunity to present his side of the story may be satisfied by an informal give and take between the student and the principal so long as notice effective to allow a student to respond has been given. *See id.* at 583–84, 95 S.Ct. 729. However, although the Supreme Court set forth these guidelines as the minimum process required for the imposition of short suspensions in school disciplinary matters, the Court also recog-

nized that the interpretation and application of the Due Process clause is very practical and some unusual situations involving short suspensions may nonetheless require something more than rudimentary procedures. *See id.* at 578, 584, 95 S.Ct. 729. The situation before the Court is one of these unusual situations in which a give and take exchange with the principal may not be sufficient to satisfy the student's due process rights.

### a. Bias

■ Particularly relevant to any due process violations in this case is the alleged actual bias of Richmond in pursuing punishment against a student for a rumor that affected him personally. In a school disciplinary context, the level of impartiality required for the decision maker does not reach the absolute neutrality required in the criminal justice system. *See* Swem, *supra* at 371. Impartiality is presumed in the school context and due process is not implicated simply because the disciplinarian observed the conduct, had some knowledge regarding it, or even investigated prior to the hearing. *See* Larry Bartlett and James McCullagh, *Exclusion From the Educational Process in the Public Schools: What Process is Now Due*, 1993 B.Y.U.Educ. & L.J. 1, 24 (1993) (stating that a school official can perform multiple functions and still be presumed fair). However, when the principal's level of personal involvement is so great as to allow a jury to determine that any decision must have been decided with partiality, as in the present case, due process rights may be violated. *See id.*

■ While the Constitution does not guarantee a decision maker free from the appearance of bias, it does require one who is free of actual bias. *See Levitt v. University of Texas at El Paso*, 759 F.2d 1224, 1233 (5th Cir.1985). Due process violations may therefore occur when the principal is biased or "in any way unable to function fairly as a trier of fact." *Murray*

*v. West Baton Rouge Parish School Board,* 472 F.2d 438, 443 (5th Cir.1973); *see also Brewer v. Austin Independent School District,* 779 F.2d 260, 264 (5th Cir.1985). This case is unusual because of the personal nature of Richmond's involvement in the alleged sexual misconduct.

■ As part of their regular duties, high school principals sometimes must deal with insulting conduct directed towards themselves or the teachers under their supervision. *See, e.g., Keough v. Tate County Board of Education,* 748 F.2d 1077, 1079 (5th Cir.1984) (considering it a routine disciplinary matter when a principal disciplined a student for cursing the principal and challenging him to a fight, among other transgressions); *Greene v. Moore,* 373 F.Supp. 1194, 1196 (N.D.Tex. 1974) (student threw coffee on teacher followed by the coffee cup which resulted in minor injuries and broken glasses). However, the conduct alleged in this particular situation is of such an obviously personal nature that any reasonable administrator would have deferred to another uninvolved individual to conduct any investigation or to mete out any discipline. While Richmond asserts that he left the initial questioning of Riggan to Kelly,[1] the record could allow a jury to conclude that he actively pursued the remainder of the investigation and punishment, and then appeared before Mr. Cummins at the Level II hearing to act as a prosecutor. It was only after this second hearing that future supervision of Riggan was assigned to another administrator because Richmond threatened civil litigation during the Level II hearing. Under the circumstances, there is a genuine issue as to a material fact regarding whether Richmond's bias tainted both his initial hearing and the second level hearing before Mr. Cummins.

**b. Notice**

■ Plaintiff also argues that the proceedings in the present case are deficient in that Riggan was never afforded effective notice of the charges against him or of the evidence against him to allow him to respond. It is undisputed that Richmond failed to issue a written decision after the Level I hearing, detailing his decision and the basis and evidence in support. This failure alone is not necessarily a due process violation. *See Garrett v. Mathews,* 625 F.2d 658, 660 (5th Cir.1980) (finding that not every violation of a university's regulations rises to the level of a due process violation); Swem, *supra* at 367 (noting that while due process requires that schools follow their established procedures, it is generally harmless error if those procedures are breached). However, the lack of any written decision from the Level I hearing is relevant to whether Riggan was ever given adequate notice of the conduct for which he was being disciplined or the evidence against him.

Riggan claims in his response to the Defendants' Motion for Summary Judgment that he was not told what provision of the MISD Disciplinary Code of Conduct he was charged with violating until the actual Level II hearing, after the time had passed for him to collect and present evidence. The offense charged was changed after the Level II hearing from retaliation to disrespect to an adult. Riggan further asserts in an affidavit that he never received notice of the exact conduct for which he was being disciplined and that in his discussions with Richmond no mention was made about the graduation ceremony T-shirt plot, but only about the photographs of the car.

It is even unclear from the testimony and evidence before the Court exactly what conduct was the subject of discipline and therefore a jury could reasonably de-

---

**1.** In his deposition, Mr. Richmond asserts that he requested the investigation by Kelly in order to get Riggan to "confess." This declaration is not supported by the testimony of any of the other Defendants and thus causes the Court to consider this a credibility determination more appropriate for a jury.

termine that Riggan was never given meaningful notice of what he had done wrong. Among the various acts and events attributed to Riggan throughout the motions and depositions are the rumor of Richmond's alleged sexual misconduct that Riggan either started or perpetuated; following Richmond while off school grounds and taking a picture of his car parked on a public street; possessing this picture and either showing it or not showing it to others while misrepresenting what it reveals; an alleged plot to humiliate Richmond at the graduation ceremony by distributing T-shirts with the picture of Richmond's car; and causing disruptions at Midland High (apparently by his possession of the pictures) by inciting teachers, students, administrators, and even custodians to talk. There is little actual evidence before the Court other than Riggan's affidavit and the Level II written decision by Cummins addressing specifically Riggan's notice of what he had done wrong or was being charged with. The Level II findings only detail the specific charge against Riggan and not the conduct constituting the offense. In their depositions, Richmond describes a litany of offenses justifying Riggan's punishment, and the other Defendants explain their varied understandings of the conduct being punished, but unless Riggan was given effective notice of these transgressions before his disciplinary proceedings to allow him to respond, it is not sufficient due process.

### c. Subsequent Hearings

As discussed above, therefore, the Level I hearing could be found constitutionally infirm because a jury might reasonably conclude that Riggan was never given effective notice of the charges and was disciplined by an obviously biased party. Generally, due process violations in an initial hearing may be cured by subsequent hearings. *See Sullivan v. Houston Independent School District,* 475 F.2d 1071 (5th Cir. 1973). However, in this case, a genuine issue is present as to whether the subsequent hearings were sufficient to cure the procedural infirmities. The Level II hearing was arguably tainted by the bias of Richmond in that he participated in his role as principal (as well as aggrieved party) to actively pursue the punishment that he had initially imposed. Furthermore, an issue exists as to whether Riggan received effective notice of the charge against him before the hearing began, or after it was too late for him to collect and present evidence.

Although Cummins eventually reduced the charge from retaliation to disrespect to an adult, issues further exist as to whether Riggan was materially prejudiced by his inability to present evidence or counter the evidence alluded to by Richmond. For example, an issue exists as to how harmful was the Principal's assertion at the Level II hearing that he had approximately 18 statements from students, faculty members, administrators, and community members, all to the effect that Riggan had spread the rumor circulating about Richmond. Cummins never asked to see these statements, nor were they produced or further described. In fact, the statements were verbal statements that had not been reduced to writing (and therefore there was nothing to produce). It now appears that there may even be a question as to whether these statements actually do implicate Riggan as the source of the rumor, which could have been explored by Riggan at the hearing if he had been given notice of the evidence against him. A jury might believe that Richmond misrepresented, misinterpreted, or even fabricated the evidence. An issue thus exists as to whether this materially prejudiced Riggan because a jury could reasonably determine that Cummins made his decision based on the evidence Richmond implied he had as well as Riggan's failure to produce anything other that his bare assertion of innocence.

Similarly, an issue exists as to whether the Level III hearing was sufficient to correct the constitutional violations. As discussed above, Riggan arguably did not

have adequate notice in time to respond to the charges against him. No additional evidence is permitted at a Level III hearing so the denial of an opportunity to be heard at the previous hearings cannot be cured. In fact, Riggan attempted to respond to the allegations presented for the first time at the Level II hearing by bringing witnesses to the Level III hearing. Based on Board procedures, these witnesses were not heard and the Board made its decision solely on the records of the two previous questionable hearings and the arguments of counsel. There is also a question as to whether Defendant Manulik went beyond this limited record to insert evidence of her own in favor of Richmond. Under all the circumstances, a jury might conclude that this type of hearing could not cure the initial errors in the proceedings. Therefore, a genuine issue is present as to whether all of the hearings conducted in this matter as part of the grievance procedure were sufficient to afford Riggan the minimum due process rights of notice of the charges against him, an explanation of the evidence against him, and the opportunity to present his side of the story. Accordingly, Defendants' Motion for Summary Judgement as to the procedural due process claims is DENIED.

## C. Substantive Due Process

■ Defendants also move for summary judgment on the substantive due process claims asserted by Plaintiff. Plaintiff did not respond to this part of the motion in his response. Generally, disciplinary actions must be "arbitrary, capricious, or wholly unrelated to the legitimate state goal of maintaining an atmosphere conducive to learning" in order to contravene constitutional substantive due process protections. *See Hassam v. Lubbock Independent School District*, 55 F.3d 1075, 1081 (5th Cir.1995). While Mr. Richmond's conduct in using his position as principal to prosecute a perceived injury to his reputation appears to meet the standard quoted above, that conduct is more properly con-

sidered under the procedural due process claims discussed above. *See, e.g., Breeding v. Driscoll,* 82 F.3d 383, 387 (11th Cir.1996) (noting that plaintiff's claim that the principal was biased against her in the disciplinary process was more properly a procedural due process claim rather than substantive). Therefore, because the alleged wrongdoing by the Defendants in this case is more properly analyzed under procedural due process protections and because Plaintiff has apparently abandoned this claim by not responding to the motion for summary judgment on this issue, the Defendants' Motion for Summary Judgment as to substantive due process claims is GRANTED.

## D. Fifth Amendment Claims

■ As a third ground for summary judgment, Defendants assert that Plaintiff's claim of Fifth Amendment violations fails as a matter of law. Once again, Plaintiff has apparently abandoned this claim by not responding to this part of Defendants' admittedly exhaustive motion. Plaintiff's claim of Fifth Amendment violations raises the issue of whether the school and its officers can be civilly liable for requiring a student to apologize. In this case, the original charge of retaliation as defined by the Texas Penal Code carried a mandatory referral to the Midland Police Department. Riggan complains that a letter of apology would inevitably force him to incriminate himself while he simultaneously faced possible criminal prosecution. Defendants counter that the letter of apology did not require Riggan to incriminate himself but could have said just about anything. Superintendent Joseph Baressi testified that "he can say whatever he wants to. He could say, you know, I'm sorry you're offended. I didn't intend to offend you. I didn't do anything to offend you. P.S. Lee sucks."

Defendants cite *Kicklighter v. Evans County School District* in support of the requirement of a letter of apology. *See* 968 F.Supp. 712 (S.D.Georgia 1997). In

*Kicklighter,* the district court found that requiring a student to apologize as part of a disciplinary action did not violate the First Amendment. *See id* at 719. In reaching that holding, the court discussed the interest of a school in educating students as to civility and cultural values and promoting respect for authority and social, moral, and political values. *See id.* It is difficult to understand how the letter of apology described by Dr. Baressi fulfills that educative purpose, but the Court will not evaluate the effectiveness of the school's actions, only potential constitutional violations. As discussed by the *Kicklighter* court, such apologies are generally well within a school official's authority, even if objected to or not appreciated by the student.

In the present case, however, Plaintiff raised claims under the Fifth Amendment privilege against self-incrimination in objection to the forced apology. Generally, the Fifth Amendment has been interpreted to mean that a person has the privilege not to answer questions by state officers in civil or criminal proceeding, whether formal or informal, if these questions may incriminate him in a subsequent criminal proceeding. *See Minnesota v. Murphy,* 465 U.S. 420, 426, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (quoting *Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973)). Although there is an abundance of case law on when the forced confessions of criminal defendants and prisoners may be used in criminal prosecution against them, the issue of whether a school may be subject to civil liability under the Fifth Amendment for requiring a letter of apology appears to be one of first impression. Given that the retaliation charge was reduced to the more ambiguous disrespect to an adult charge, which is not defined in the Texas Penal Code and does not require a referral to local police, and given the fact that no criminal action has apparently been instituted against Riggan for any illegal conduct, the Fifth Amendment claim does not appear to be a ripe case or controversy suitable for deter-

mination by Federal Court. A decision on the constitutionality of a forced letter of apology that might contain incriminating statements that might have been used against the Plaintiff in a possible anticipated criminal action under a charge that has been dropped would be advisory at best. Therefore, as Plaintiff has apparently wisely abandoned this claim, the Defendants' Motion for Summary Judgment as to the Fifth Amendment claims is GRANTED.

## E. First Amendment Claims

Defendants' next point in their summary judgment motion is on Plaintiff's claims of violations of his First Amendment rights. Defendants quote from numerous cases in support of their contention that students' First Amendment rights are not synonymous with the rights of adults outside the school system and that students' rights may be abridged if the exercise of those rights substantially interferes with school activities. While Plaintiff concedes that the rights of schoolchildren may be curtailed in certain circumstances, he points out that all cases cited by Defendant involved speech or expressive activity that occurred on campus. In contrast, Plaintiff notes that his expressive activity, taking and possessing photographs of Mr. Richmond's car on a public street, occurred off campus. There is no evidence that Riggan brought the photographs to school or took them during school hours, and there is similarly no evidence that any substantial disruption occurred because of Riggan's activities.

Students certainly retain their First Amendment rights to express their opinions, even silly ones about the school officials, whether "in the cafeteria, or on the playing field, or on the campus during authorized hours." *See Tinker v. Des Moines Independent School District,* 393 U.S. 503, 512–13, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). However, this right to express opinions is not absolute. "[C]onduct by the student, in class or out of it, which for

any reason—whether it stems from time, place, or type of behavior—materially disrupts class work or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513, 89 S.Ct. 733. In other words, Riggan did not have the absolute right to plan a public humiliation of his principal at graduation ceremonies, even though that may have been his way of expressing his opinion of Mr. Richmond. It is well within the parameters of school officials' authority to prohibit the public expression of vulgar and offensive comments and to teach civility and sensitivity in the expression of opinions. *See Bethel School District No. 403 v. Fraser,* 478 U.S. 675, 683, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (sustaining the punishment of a student for a speech laden with sexual innuendos at a mandatory school assembly); *Poling v. Murphy,* 872 F.2d 757, 758 (6th Cir.1989) (affirming the punishment of a student who insulted a vice principal during a speech at a mandatory school assembly).

Both of the cases cited above involved speeches made under the auspices of school authority at mandatory student assemblies. The Supreme Court has given greater lenience to school officials in the regulation and control of school sponsored speech or expression "to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school." *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 271, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). Although Defendants may be able to show that a plan to distribute T-shirts at graduation ceremonies is comparable to the school assembly speeches of *Bethel* and *Poling,* there is no evidence at this point that any of Riggan's expressive conduct occurred as part of school sponsored activities.

Even expressive conduct that merely occurs at school without being part of a school sponsored activity may be restricted if that conduct causes a substantial disruption or material interference with school activities or if school officials reasonably believe that such a disruption will occur. *See Tinker,* 393 U.S. at 509, 89 S.Ct. 733; *Clark v. Dallas Independent School District,* 806 F.Supp. 116, 120 (N.D.Tex.1992) (where school sponsored activities are not involved but the suppressed student's expression happens to occur on school premises, the defendants have the burden to establish that the restriction was necessary to avoid material disruption with school operations). This reasonable belief must be based on fact, not intuition or the simple pronouncement of the superintendent or principal that disruption is likely to occur. *See Butts v. Dallas Independent School District,* 436 F.2d 728, 732 (5th Cir.1971).

The main obstacle to a summary disposition of the Plaintiff's First Amendment claims at this time is the problem noted above in the discussion of the procedural due process claims, namely that it is unclear exactly what conduct Riggan was punished for. Defendants argue that Plaintiff was punished for the alleged plan to mass-produce T-shirts displaying the photograph for distribution at graduation. Such an activity is expressive activity that would be covered by the First Amendment; however, it is also disruptive enough to justify regulation by school officials. Plaintiff denies any intention of producing or distributing the T-shirt, but more importantly claims that this conduct was only brought to light after the present lawsuit was brought and therefore was not the basis for his punishment. Defendants may be able to show a reasonable belief that Riggan's other conduct in taking and possessing the picture was substantially disruptive to the educational process, but the summary judgment evidence presently before the Court is insufficient on this issue at this time. The deposition of an

interested party, Mr. Richmond, claiming that there was a disturbance is adamantly opposed by the affidavit of another interested party, Casey Riggan, claiming that there was no disturbance. Such a controversy appears to be dependant on a credibility determination that is more appropriate for a jury after a full trial on the issues. Hence, full discovery is necessary since this determination cannot be made without more evidence. Accordingly, the Defendants' Motion for Summary Judgment as to Plaintiff's First Amendment claims is DENIED.

### F. Conspiracy Claims

■ Plaintiff's conspiracy claims similarly hinge on credibility determinations that are not appropriate on summary judgment. Defendants dismiss this claim as "a baseless inflammatory attempt to create an air of impropriety around the actions of the school board," and point to the Minutes of the school board meeting in which the discussion was labeled "potential settlement" talks as conclusive evidence of the nature of their actions. Despite Defendants' comment that lawsuits are settled every day and therefore dismissed as a result, this Court does take notice of the Plaintiff's contention that there is no greater intimidation to a high school senior than the prospect of banishment from graduation ceremonies. The imbalance of power in this situation is great enough to warrant a closer look, beyond simply what the Defendants have chosen to call their actions in their Minutes. There is certainly a question as to whether this was a settlement negotiation between attorneys and parties to a lawsuit or simply a pronouncement from a group of adults threatening an 18–year–old boy with exclusion from graduation ceremonies unless he dismissed his lawsuit or otherwise complied with their demands by writing the disputed letters of apology. The Court has already found that at least a material question of fact exists as to both Plaintiff's procedural Due Process and First Amendment claims, and therefore his claim that

Defendants conspired to deprive him of those rights survives. Plaintiff further alleges that the "settlement" offer of Defendants was actually an attempt to intimidate a litigant who has filed a federal lawsuit. Given the substantial imbalance of power between the parties and the conduct of the Defendants in issuing what they characterize as a settlement offer, at least a substantial question of fact and credibility exists to defeat Defendants' summary judgment motion on this claim. Therefore, the Motion as to Plaintiff's conspiracy claims is DENIED.

### G. State Constitutional Claims

■ Defendants next request summary judgment on Plaintiff's state constitutional claims on the basis that Texas law does not allow the award of monetary damages for a violation of the Texas constitution. *See O'Bryant v. City of Midland,* 949 S.W.2d 406, 413 (Tex.App.—Austin 1997, review granted) (citing *City of Beaumont v. Bouillion,* 896 S.W.2d 143, 149 (Tex.1995)). It is undisputed, however, that Texas law does allow the recovery of equitable relief for state constitutional violations. *See id.* Although no equitable relief appears to be available at this time as the graduation ceremonies have long since past and Riggan is no longer a student at MISD, other equitable forms of relief may become apparent after further discovery (for example, if records of the disciplinary action remain on Riggan's transcript). Therefore, to allow Plaintiff the opportunity to explore what forms of equitable relief may be available to him, summary judgment on the state constitutional claims will be DENIED.

### H. Qualified Immunity

As a final basis for summary judgment, the Defendants assert they are entitled to qualified immunity from Plaintiff's claims. To this end, Defendants allege that as Defendants Martha Manulik, George Lara, Glen Bufler, Shane Boring, Patricia Hodg-

es, James Fuller, Becky Oekerman, Joe Cummins, Jimmie Kelly, and Joseph Baressi (the "School Board Defendants") were apparently only named in their official capacity, they should be dismissed from the suit. This claim is not developed in the brief and therefore will not be considered by the Court at this time.

■ Defendant Neil Richmond also claims that he is entitled to summary judgment on all claims based on the doctrine of qualified immunity because he asserts he did not violate a clearly established right of which a reasonable person would have known. Because the Court finds that Plaintiff has asserted colorable claims of violations of his Fourteenth Amendment Due Process rights and possibly also of his First Amendment rights, and that a material fact issue remains as to the objective reasonableness and good faith of all Defendants' actions, the Defendants' claims for qualified immunity will be DENIED at this time.

Qualified immunity claims are evaluated in a two-step analysis. *See Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). First, the Court determines whether the Plaintiff has alleged a violation of a clearly established constitutional right under currently applicable law. *See Systems Contractors Corporation v. Orleans Parish School Board,* 148 F.3d 571, 574 (5th Cir.1998). If the Plaintiff has alleged a colorable claim for violations of his constitutional rights, the Court will next examine whether the Defendants' actions were objectively reasonable in light of the law as clearly established at the time Defendants acted. *See id.* While it is generally true that school officials are entitled to qualified immunity for "action[s] taken in the good-faith fulfillment of their responsibilities and within the bounds of reason under all the circumstances," this immunity protection is not absolute. *See Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). Under the two part test outlined above, a school official may not be immune from liability for an action taken in violation of a student's constitutional rights if he knew or reasonably should have known that his actions would violate that student's rights, or if he acted with the malicious intention to violate that student's rights. *See id.*

■ Plaintiff has alleged in this case legitimate claims of violations of his due process rights. The due process rights afforded to school children in school disciplinary cases are well established since *Goss v. Lopez,* and are very minimal, amounting to little more than bare notice of the charges brought and conduct questioned and an opportunity to be heard, whether formal or informal. Despite this low standard for the school officials, Plaintiff has managed to raise a material fact question as to whether he ever received effective notice so as to allow him a meaningful opportunity to be heard. Furthermore, the apparent and obvious bias of Mr. Richmond tainted all of the hearing with which he was involved and seriously contributed to the procedural violations. The course of conduct of all Defendants throughout the time period in question certainly does not allow this Court to determine as a matter of law that the Defendants acted reasonably or in good faith. Rather, these issues remain fact questions and credibility determinations that should be explored further in discovery and ultimately submitted to a jury.

The Defendants are similarly not entitled to qualified immunity at this time on the other issues remaining in this case because of the fact issues that remain to be explored as discussed at length above. The parties have proceeded thus far on limited discovery for the purpose of determining whether this Court has jurisdiction to decide the matters raised by Plaintiff. Now that jurisdiction is established, further discovery is appropriate and necessary. Therefore, at this time Defendants' motion for summary judgment on qualified immunity grounds is DENIED.

## CONCLUSION

This Court has jurisdiction over the present dispute despite Defendants' repeated characterization as a mere school disciplinary matter because Plaintiff Casey Riggan has asserted colorable claims of constitutional violations. Riggan, like all other Texas school children, has a property interest in education that demands due process protections before disciplinary suspensions. These due process rights of students are extremely minimal, amounting to little more than basic notice of the conduct at issue, the charges brought, and the evidence against the student as well as some opportunity to be heard. Nonetheless, Plaintiff has raised a significant fact issue as to whether even this minimal burden was met because he was allegedly not given effective notice or an opportunity to be heard and because all the hearings conducted in this incident were allegedly tainted by the actual bias of Mr. Richmond. Therefore, Defendants' Motion for Summary Judgment as to Plaintiff's procedural due process claims will be DENIED. However, the violations alleged in this lawsuit are more appropriately analyzed under procedural due process violations, and therefore the Defendants' Motion for Summary Judgment as to Plaintiff's substantive due process claims will be GRANTED.

Although Plaintiff raises some interesting questions about the use of letters of apologies for discipline in charges carrying a mandatory referral to the local police, these questions are moot. The initial charge of retaliation was reduced to disrespect to an adult which does not carry a mandatory referral, and therefore the question of whether a letter of apology violates Plaintiff's Fifth Amendment rights is not properly before the Court. Defendants' Motion for Summary Judgment as to Plaintiff's Fifth Amendment claims is GRANTED.

The remainder of Plaintiff's claims that are subject to Defendants' Motion for Summary Judgment all require further development in discovery. Plaintiff has raised a material fact issue as to his conspiracy claim which is not defeated by Defendants' presentation of their Minutes labeling the potential conspiracy discussions a "settlement." The First Amendment claims suffer from the lack of information as to what conduct Riggan was disciplined for and whether there was any reasonable expectation of disturbance resulting from that conduct. Finally, the State Constitutional claims require further discovery into what equitable remedies may be available to Plaintiff if any. The Defendants' Motion for Summary Judgment as to each of these claims will be DENIED.

Finally, Defendants' Motion for Summary Judgment on grounds of qualified immunity are denied at this time as there remain substantial factual issues as to the reasonableness and good faith of the Defendants with reference to the alleged constitutional violations that have survived summary judgment. Accordingly,

It is ORDERED that Defendants' Motion for Summary Judgment for lack of jurisdiction be DENIED.

It is ORDERED that Defendants' Motion for Summary Judgment as to Plaintiff's procedural due process claims be DENIED.

It is ORDERED that Defendants' Motion for Summary Judgment as to Plaintiff's substantive due process claims be GRANTED.

It is ORDERED that Defendants' Motion for Summary Judgment as to Plaintiff's Fifth Amendment claims be GRANTED.

It is ORDERED that Defendants' Motion for Summary Judgment as to Plaintiff's First Amendment claims be DENIED.

It is ORDERED that Defendants' Motion for Summary Judgment as to Plaintiff's conspiracy claims be DENIED.

It is ORDERED that Defendants' Motion for Summary Judgment as to Plaintiff's state constitutional claims be DENIED.

It is ORDERED that Defendants' Motion for Summary Judgment for qualified immunity be DENIED.