# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1668

_____

Elizabeth Jennings; Steve Jennings;     *
Elizabeth Jennings, as next friend of    *
Rachel Jennings; Nadine Schwaigert;    *
Fred Schwaigert; Nadine Schwaigert,    *
as next friend of Lauren and Sarah    *
Schwaigert,    *
   *
     Plaintiffs/Appellants,    *
   *    Appeal from the United States
     v.    *    District Court for the Eastern
   *    District of Missouri.
Wentzville R-IV School District; John    *
Waters, as Principal of Wentzville Holt    *
High School; Diane Moran, as Teacher    *
at Wentzville Holt High School;    *
Michelle Senda, as Cheerleading    *
Advisor at Wentzville Holt High School,*
   *
     Defendants/Appellees,    *
   *
Kimberly Miller,    *
   *
     Defendant.    *

_____

Submitted: November 16, 2004
Filed: February 16, 2005

_____

Before RILEY, JOHN R. GIBSON, and GRUENDER, Circuit Judges.

_____

RILEY, Circuit Judge.

This federal case charges violations of procedural due process and failure to train, arising from a school district's ten-day suspension of two student cheerleaders who consumed alcohol shortly before performing at a school football event.[1]  The parents of two high school students claim the Wentzville R-IV School District (District) and certain members of its staff violated the Fifth and Fourteenth Amendment rights of their respective daughters, Rachel Jennings (Rachel) and Lauren Schwaigert (Lauren).  The parents appeal the district court's[2] adverse grant of summary judgment in favor of the District and its staff.  We affirm.

## I.    BACKGROUND

Rachel and Lauren, members of the Holt High School varsity cheerleading squad (squad), drank vodka at another student's house after school on August 30, 2002, before attending a cheerleading photograph session.  After the photo session, the two returned to their friend's house and finished drinking their vodka drinks.  At approximately 7:00 p.m., Rachel and Lauren left the house to attend a football jamboree at Holt High School, where the squad performed until 9:00 p.m.  During the performance, some squad members suspected others on the squad had consumed alcohol before the jamboree.  One squad member testified Rachel, during warmups before the game, confided, "Don't tell anyone, me and Lauren are drunk."  During the game, Diane Moran (Moran), the varsity cheerleading advisor, was informed of one squad member's suspicions.  After the jamboree, Moran met briefly with the squad to discuss the evening's performance, after which the individual members left the

---

[1]A third cheerleader was also a subject of the allegations, investigation, and disciplinary action involved in this case, but is not involved in this litigation.

[2]The Honorable Frederick R. Buckles, United States Magistrate Judge for the Eastern District of Missouri, to whom this case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

football field. Moran also talked with Lauren and the third cheerleader about rumors they had consumed alcohol before the jamboree. Later that night, Moran received telephone calls at her home from various cheerleaders, who informed Moran they were quitting the squad. After Moran learned five squad members were gathered at a cheerleader's home, Moran went to that home to rectify the situation. When Moran arrived, these squad members declared they could not cheer with girls who had been drinking before the game. Moran decided the squad should not talk about Rachel and Lauren without them present to defend themselves, so Moran drove to Rachel's and Lauren's homes, picked them up, and brought them to the meeting. Rachel and Lauren attended the meeting from approximately 11:00 p.m. to 2:00 or 2:30 a.m., after which Moran drove them home. At the meeting, neither Rachel nor Lauren admitted consuming alcohol before the jamboree.

The next day, Moran spoke to Rachel's parents, Steve and Elizabeth (Elizabeth) Jennings, and to Lauren's mother, Nadine Schwaigert (Nadine), about the events from the previous night. Both Rachel and Lauren admitted to their mothers that they consumed alcohol before the jamboree. On Monday, September 2, Moran told school Activities Director David Gerdeman (Gerdeman) about the possibility Rachel and Lauren drank alcohol on August 30, and about the meeting Moran had with the cheerleaders that night. On September 3, Gerdeman told Principal John Waters (Waters) about the allegations of alcohol consumption and about the late-night meeting. Waters met with District Superintendent Dr. Thomas Byrnes (Dr. Byrnes) and Assistant Principals Richard Fohey (Fohey) and Frank Barro (Barro). Dr. Byrnes told school administrators to investigate the allegations against Rachel and Lauren, but to do so "from scratch" without using information obtained during the late-night meeting Moran conducted. Waters met with the varsity cheerleading squad after school on September 3 and, without mentioning Rachel's or Lauren's names, informed them the District would not use information obtained during the late-night meeting. On September 5, Waters and Dr. Byrnes removed Moran from her

cheerleading advisor position, based on their belief Moran exhibited poor judgment in conducting such a late-night meeting.

The same day, Waters interviewed Rachel and invited Elizabeth to attend, which she did. Elizabeth informed Waters they would not answer any questions about alcohol consumption on August 30, although Rachel denied being under the influence of alcohol on August 30. Waters also attempted to meet with Lauren that day, but after Waters invited Nadine to attend, she withdrew Lauren from school. On September 9, Rachel's and Lauren's parents filed the present lawsuit under 42 U.S.C. § 1983, and pursuant to Missouri state law.[3]

In response to the lawsuit, the District's attorney advised the administration to obtain written statements from students about the events involved in this case. Several students informed Waters they saw Rachel and Lauren consume alcohol before the jamboree. On September 17, based on "overwhelming evidence," Waters decided to impose a ten-day, out-of-school suspension on Rachel and Lauren for being under the influence of alcohol at a school function, in violation of school policy. When Waters called to inform Elizabeth about the suspension, Elizabeth abruptly ended the conversation and told Waters any further communication would be through her attorney. Waters attempted unsuccessfully to contact Nadine and her husband, Fred, eventually leaving a message on their answering machine informing them of the decision to suspend Lauren and inviting them to contact him if they had any questions. On September 18, Fohey and Barro sent written confirmations to the parents of the ten-day suspensions for alcohol use, which letters also informed the parents they could seek review of the suspensions in accordance with school board

---

[3]After dismissing the section 1983 claims, the district court declined supplemental jurisdiction of the plaintiffs' state law claims and dismissed them without prejudice.

policy by request of the principal and superintendent. Neither Rachel's parents nor Lauren's parents ever contacted any school administrator regarding this matter.

Under the Student Code of Conduct, as set out in the District's Discipline Code, a first offense for alcohol use or possession is punishable by a ten-day, out-of-school suspension. Rachel knew consuming alcohol before a school event violates the policy, and Lauren was aware the policy called for a ten-day suspension for alcohol use.

When Moran joined the District's staff in 2000, she attended a two-day orientation program designed to familiarize new teachers with the District's Discipline Code and the high school's Student Code of Conduct. Three times each school year the District also provides training for coaches regarding disciplinary measures when responding to student misconduct. Moran, who became involved in the cheerleading program in 2001, had not yet attended this training, but had received a folder regarding the regulations of the Missouri State High School Activity Association (MSHSAA).

## II.    DISCUSSION

"We review the district court's grant of summary judgment *de novo*." Interstate Cleaning Corp. v. Commercial Underwriters Ins. Co., 325 F.3d 1024, 1027 (8th Cir. 2003). "We will affirm a district court's grant of summary judgment 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . .' demonstrate that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." Id. (quoting Fed. R. Civ. P. 56(c)).

### A.    Failure to Train

The parents first claim Rachel's and Lauren's constitutionally protected liberty rights were violated because the District "patently fail[ed] to train, educate, warn and

instruct [its] employees in the proper manner of conducting investigations into allegations of student misconduct." To establish the District's liability under section 1983 for failure to train employees adequately, the parents must prove the failure to train in a relevant respect demonstrated a "deliberate indifference" to the students' constitutional rights. City of Canton v. Harris, 489 U.S. 378, 389 (1989); Larson v. Miller, 76 F.3d 1446, 1454 (8th Cir. 1996) (en banc). To show deliberate indifference, the parents must prove the District "had notice that its procedures were inadequate and likely to result in a violation of constitutional rights." Larson, 76 F.3d at 1454 (citation omitted). Notice to the District may be implied when (1) "the failure to train is so likely to result in a constitutional violation that the need for training is patently obvious," or (2) "a pattern of misconduct indicates that the school district's responses to a regularly recurring situation are insufficient to protect the students' constitutional rights." P.H. v. Sch. Dist. of Kansas City, 265 F.3d 653, 660 (8th Cir. 2001). The parents rely on the first implication, claiming it was "patently obvious" the District's failure to train Moran adequately would result in violation of constitutional rights.

Like the district court, we assume without deciding that Rachel's and Lauren's presence at the cheerleader's residence on August 30 and 31 amounted to a deprivation of their liberty sufficient to invoke constitutional protections. In analyzing the alleged failure to train, we focus on the District's training policy, not on the way Moran absorbed the training. Larkin v. St. Louis Hous. Auth. Dev. Corp., 355 F.3d 1114, 1117 (8th Cir. 2004). The parents concede the District "provided training in the manner in which employees should conduct investigations and report allegations of misconduct to school officials, namely assistant principals." Indeed, the District required all of its teachers be trained on the manner in which to conduct investigations into student misconduct. Holt High School provided three basic training sessions per year (fall, winter, and spring) for coaches, including cheerleading advisors, regarding disciplinary matters.

Although the parents contend Moran did not attend the training sessions and there was no requirement she do so, the evidence does not support this argument. The parents rely on selected pages from Moran's deposition transcript and cite them out of context. A complete and fair reading of the evidence clearly indicates Moran received some training on the District's disciplinary policies. Moran attended a two-day orientation seminar when she began her employment with the District, at which time she received training on a "myriad" of topics, including her responsibilities as a teacher, classroom management, the Student Code of Conduct and the District's Discipline Code. Moran was instructed to follow those policies. After becoming cheerleading advisor, Moran received written materials from Gerdeman about MSHSAA regulations, because Moran had missed an earlier training session on those regulations. In 2002, Moran also attended a meeting for coaches with Gerdeman in the school auditorium, receiving training on the District's Discipline Code and the Student Code of Conduct.

Nothing in the record suggests the District had any hint its policies were inadequate and likely to result in constitutional violations. The training of District employees was ongoing. There is no evidence of other late-night meetings, nor any other complaints or indication the District's failure to offer additional training would likely result in some constitutional violation. See P.H., 265 F.3d at 661. A single incident, under these circumstances, is insufficient to make a lack of training patently obvious, see Palmquist v. Selvik, 111 F.3d 1332, 1347 (7th Cir. 1997), and, as the district court noted, effective training need not specifically address every conceivable situation an employee may encounter, see P.H., 265 F.3d at 661. That a particular teacher, or cheerleading advisor, might be unsatisfactorily trained does not alone suffice to represent District policy and make the District liable. The teacher's or advisor's shortcomings may have resulted from factors other than a flawed training program, such as occasions when an otherwise sound program is administered negligently. See City of Canton, 489 U.S. at 390-91. Because the District did not have notice that its training policy was inadequate, the parents have failed to show

deliberate indifference.  See, e.g., Thelma D. v. Bd. of Educ., 934 F.2d 929, 935 (8th Cir. 1991).  Therefore, we conclude the parents did not present sufficient evidence to support a section 1983 claim for failure to train.

### B.    Procedural Due Process

The parents claim Rachel and Lauren were denied their procedural due process rights to an impartial decisionmaker, to be represented by counsel, and to impeach the evidence against them.  The District argues that, because Rachel and Lauren received all the process they were due for the suspension, there is no constitutional violation upon which municipal liability can be based.

In Goss v. Lopez, 419 U.S. 565 (1975), the Supreme Court addressed the due process protection available to students facing temporary suspensions.  The Court recognized "[a] 10-day suspension from school . . . may not be imposed in complete disregard of the Due Process Clause," because a student's "legitimate entitlement to a public education [is] a property interest" protected thereby.  Id. at 574, 576.  The Court held "due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story[,]" though "[t]here need be no delay between the time 'notice' is given and the time of the hearing."  Id. at 581-82.  The Court "stop[ped] short of construing the Due Process Clause to require, countrywide, that hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident."  Id. at 583.

The record persuasively indicates Rachel and Lauren were afforded due process.  Rachel and Lauren received notice they were being charged with violating school policy by consuming alcohol before a school event.  Waters talked to Rachel about the charge and gave her an opportunity to respond.  After additional

investigation, Waters informed Elizabeth that Rachel would be suspended for ten days, based on "overwhelming evidence," but Elizabeth terminated the discussion without permitting Waters to explain what evidence he possessed. Waters also scheduled a meeting with Lauren to discuss the charge and give her an opportunity to respond. However, Nadine removed Lauren from school, which prevented this meeting. After an investigation, Waters attempted to contact the Schwaigerts to inform them Lauren would be suspended for ten days, but was only able to leave a message on their answering machine. Without providing details, Waters informed the Schwaigerts his decision was based on "overwhelming evidence," and invited them to contact him to discuss the matter. Neither the Jennings nor the Schwaigerts contacted Waters. Both Rachel and Lauren, as well as their parents, were given the "opportunity to present [their] side of the story," which is all that is required. Id. at 581.

The parents also contend Rachel and Lauren were entitled to counsel, to impeach the evidence against them, and to present evidence on their own behalf, citing Doe v. Little Rock School District, 380 F.3d 349 (8th Cir. 2004). This argument also is foreclosed by Goss. The Goss Court observed that forcing schools to impose "even truncated trial-type procedures might well overwhelm administrative facilities in many places and, by diverting resources, cost more than it would save in educational effectiveness." Goss, 419 U.S. at 583. The Court continued, "Moreover, further formalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process." Id. As noted above, Rachel and Lauren, and their parents, were advised of the charges and were afforded an opportunity to be heard. The parents alone prevented any meeting with Waters, thereby denying themselves (1) the information they now argue they were deprived, and (2) the opportunity to respond. No criminal charges were brought against Rachel and Lauren, and there is no evidence such charges were even considered. The District officials did not assume a law enforcement role. The school was enforcing

standards promulgated for the students' own welfare. Accordingly, the right to counsel was never implicated in this case.

As to Waters's partiality, the court's analysis begins "with a presumption that decision-makers are honest and impartial." de Llano v. Berglund, 282 F.3d 1031, 1035 (8th Cir. 2002) (citation omitted). Both parties cite Riggan v. Midland Independent School District, 86 F. Supp. 2d 647 (W.D. Tex. 2000), for guidance on the partiality issue. In Riggan, the court observed, "In a school disciplinary context, the level of impartiality required for the decision maker does not reach the absolute neutrality required in the criminal justice system. Impartiality is presumed in the school context and due process is not implicated simply because the disciplinarian observed the conduct, had some knowledge regarding it, or even investigated prior to the hearing." Id. at 656 (citation omitted). The court denied summary judgment because the conduct involved in the case, the principal disciplining a student who allegedly had evidence of sexual misconduct committed by the principal himself, was "of such an obviously personal nature that any reasonable administrator would have deferred to another uninvolved individual to conduct any investigation or to mete out any discipline." Id. at 657.

Waters's alleged bias does not amount to a deprivation of procedural due process. See Brewer v. Austin Indep. Sch. Dist., 779 F.2d 260, 264 (5th Cir. 1985) ("A school administrator involved in the initiation and investigation of charges is not thereby disqualified from conducting a hearing on the charges, although the facts of an occasional case may demonstrate that a school official's involvement in an incident created a bias 'such as to preclude affording the student an impartial hearing.'") (quoting Sullivan v. Houston Indep. School Dist., 475 F.2d 1071, 1077 (5th Cir. 1973)); cf. C.B. v. Driscoll, 82 F.3d 383, 387 n.3 (11th Cir. 1996) ("In the school context, it is both impossible and undesirable for administrators involved in incidents of misbehavior always to be precluded from acting as decisionmakers."). The parents' suggestion, that Waters was unconstitutionally biased because he

-10-

suspended Rachel and Lauren after this lawsuit commenced, is frivolous. No personal involvement or animus by Waters was implicated in this case. As part of his job, Waters investigated possible disciplinary violations. The investigation began well before the parents filed suit against Waters, and the suspensions were not in any way related to action the parents later took against Waters. The suspensions were clearly based on a published school policy of long standing.

We would be loath to conclude a procedural due process violation occurs when a lawsuit is filed against a school principal shortly before impending disciplinary action is taken. Such a conclusion could result in frivolous lawsuits filed against school officials, before these officials take disciplinary action, in an effort by parents and students to foreclose school discipline by "creating a bias" in the particular school official. School administrators must be free to pursue due process disciplinary procedures without the fear of disqualification from the threats and acts of litigious parents and students.

## III. CONCLUSION

Rachel and Lauren received due process, and their section 1983 claims fail. For the reasons stated, we affirm the district court's grant of summary judgment in favor of the District.

JOHN R. GIBSON, Circuit Judge, concurring specially.

I concur in the result and in the judgment.

_____