# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 8, 2011

Lyle W. Cayce
Clerk

No. 08-31249

BOBBY W SWINDLE, JR. and TRACY A SWINDLE, As Administrators of the Estate of Morgan Taylor Swindle,

Plaintiffs - Appellants

v.

LIVINGSTON PARISH SCHOOL BOARD; RANDY POPE, Superintendent of Livingston Parish School Board; PAUL PASTOREK; LOUISIANA DEPARTMENT OF EDUCATION; STATE BOARD OF ELEMENTARY AND SECONDARY EDUCATION,

Defendants - Appellees

Appeal from the United States District Court
for the Middle District of Louisiana

Before BENAVIDES, DENNIS, and ELROD, Circuit Judges.

DENNIS, Circuit Judge:

Plaintiffs, Bobby and Tracy Swindle, brought this action for damages under 42 U.S.C. § 1983 on behalf of their minor daughter, Morgan Swindle, who allegedly was deprived of her constitutional rights of procedural and substantive due process and equal protection of the laws when she was expelled from public school and refused alternative education benefits during the 2005-2006 academic school year by Defendants—the Livingston Parish School Board ("LPSB"); its Superintendent, Randy Pope; the Louisiana State Superintendent of Education;

No. 08-31249

the Louisiana Department of Education ("DOE"); and the Louisiana State Board of Elementary and Secondary Education ("BESE"). Defendants moved for summary judgment. Plaintiffs opposed that motion but did not file a cross-motion. The district court granted summary judgment in favor of Defendants dismissing all of Plaintiffs' claims. We AFFIRM the summary judgment in favor of the State Superintendent of Education, sued in his official capacity, and the DOE and the BESE, as they are entitled to state sovereign immunity from suit for money damages in federal court. Further, we AFFIRM the summary judgment dismissing Plaintiffs' claims that Morgan's procedural and substantive due process rights were violated in connection with her expulsion, the extension of her term of expulsion, and her denial of readmission as a ninth grader for the 2006-2007 school year; and dismissing Plaintiffs' claim that Morgan was denied equal protection of the laws by being denied access to an alternative education program that another student, expelled for the same reason as Morgan, was provided. However, we REVERSE the summary judgment in favor of the LPSB and Pope in respect to Plaintiffs' procedural due process claim grounded on Defendants' denial, without proper notice and a fair hearing, of the Swindles' request that Morgan continue her public education during her expulsion in an alternative education program. This decision prematurely terminated Morgan's public education benefits for the 2005-2006 academic year and caused her to reenter public school as a repeating eighth grader in 2006-2007. Accordingly, we REMAND this case to the district court for further proceedings on Plaintiffs' procedural due process claim with respect to the alleged denial of continued public educational benefits in an alternative educational program during Morgan's expulsion.

## BACKGROUND

During the 2005-2006 academic year, Morgan was thirteen years old and a student in the eighth grade at Doyle High School in Livingston Parish,

No. 08-31249

Louisiana. In October 2005, Morgan attended an evening school event, a student dance, on school property. At some point, Morgan and a small group of other students exited the dance and left the school property. One of the other students offered marijuana for the group to share in smoking. Morgan smoked the substance with the other students while off school property and away from the school dance event. The students then returned to the school property and the dance under the effects of marijuana. However, there is no evidence that Morgan possessed marijuana on school property or at the school dance event; and there is no evidence that Morgan controlled or directed other students to possess marijuana on school property or at the school dance event.

The school principal, Tony Terry, learned of the students' conduct and decided to take disciplinary action. In respect to Morgan, he decided to recommend that she be expelled for the remainder of the academic year. Under Louisiana law, Terry could not expel a student. Instead, he was required to recommend expulsion to the LPSB superintendent, who was then required to make an independent determination of the ultimate punishment. *See* La. Rev. Stat. Ann. § 17:416(C)(1). Therefore, in an undated letter to LPSB administrators, Terry explained his recommendation, stating that Morgan had admitted "to leaving [the] school function, smoking marijuana with other students, and returning to [the] school function under the influence." Further, choosing from an authorized list of grounds for expulsion, he stated that Morgan's conduct justified expulsion for the rest of the academic year based upon ground "21-Any Other Serious Offense." In his letter, Terry did not give any other ground supporting his recommendation.

On November 3, 2005, Terry wrote to Morgan's parents, informing them that "[i]t has been recommended to the Superintendent that your child be expelled from school for the remainder of this school session." As part of this letter, Terry included a chart entitled "Reason(s) [for] Expulsion," containing a

3

No. 08-31249

list of possible grounds for expulsion. On that chart, Terry again indicated that Morgan's conduct justified expulsion based upon ground "21-Any Other Serious Offense." He did not select ground "7-Use/Possess Controlled Substance," which was also listed on the chart.[1]

On November 11, 2005, Morgan and her mother attended a hearing conducted by an LPSB administrator, Paulette Foster, concerning Terry's recommendation. In light of Terry's recommendation and the information collected at the hearing, LPSB Superintendent Pope determined that Morgan should be expelled for one calendar year, rather than for the rest of the academic year, as recommended by Terry. On November 14, 2005, the Swindles were provided written notice of this decision in the form of a letter from Pope to Morgan's parents. The letter stated that "violations of Livingston Parish Public School policies, as well as local school rules pertaining to the conduct of a student, are not acceptable" and informed the Swindles that they had a right to

---

[1] The chart on the letter appears as follows:



Reason(s) Expulsion
___ 01-Willful Disobedience
___ 02-Disrespect for Authority
___ 03-False Charge Against Authority
___ 04-Use of Profane/Obscene Lang
___ 05-Immoral or Vicious Practice
___ 06-Conduct Injurious to Other
___ 07-Use/Possess Controlled Substance
___ 08-Use/Possess Tobacco or Lighter
___ 09-Use/Possess Alcohol
___ 10-Disturbs School/Violates Rules
___ 11-Vandalism
___ 12-Writes/Draws Obscenities
___ 13-Possesses Weapon(s) (Fed. Law)
___ 14-Possesses Weapon(s)
___ 15-Throws Missiles
___ 16-Fighting
___ 17-Violates Traffic/Safety Rules
___ 18-Leaves Campus or Cuts Classes
___ 19-Habitually Tardy And/Or Absent
___ 20-Is Guilty of Stealing
_x_ 21-Any Other Serious Offense

4

No. 08-31249

an administrative appeal. Pope's letter did not specify any other ground for his decision, make findings or render any decision in respect to Morgan's right to continued public education in an alternative education program or otherwise.[2] The Swindles chose not to exercise their right to an administrative appeal, but they did not waive or forfeit Morgan's other rights, including her right to continued public education in an alternative education program. *See generally Goss v. Lopez*, 419 U.S. 565 (1975); La. Rev. Stat. § 17:416.2(A)(1).

According to a diary of events prepared by Morgan's mother and introduced in the district court summary judgment record, starting on November 9, 2005—before the LPSB's hearing, but after it was clear that Morgan would

---

[2] That letter stated in full:

Dear Mr. and Mrs. Swindle:

This is to advise that as a result of the hearing held for your child **Morgan Taylor Swindle** at the **Livingston Parish Public Schools Office** on **Friday, November 11, 2005 at 9:00 a.m.,** it is my decision, after reviewing the testimony presented, that the **expulsion of Morgan Taylor Swindle for twelve (12) calendar months is to be upheld**.

I regret having to make this decision; however, violations of Livingston Parish Public School policies, as well as local school rules pertaining to the conduct of a student, are not acceptable.

**Morgan Taylor Swindle** is not to return to the **Doyle High School** campus for any reason nor is she to attend any school functions involving the **Doyle High School** for the remainder of this expulsion.

Within five days after receipt of this letter, you may request in writing that this decision be reviewed by the board members of Livingston Parish Schools.

Sincerely,

Randy K. Pope
Superintendent
Livingston Parish Public Schools

face some disciplinary action—the Swindles requested that Morgan be provided "alternative education" by the LPSB, if she were expelled. After Morgan's expulsion on November 14, 2005, the Swindles continued to request that Doyle High School, Pope, the LPSB, and the DOE provide an alternative educational program for Morgan. Their petitions were not granted. Furthermore, according to the summary judgment record presented for our review, neither Pope nor any other educational officer or entity provided the Swindles with prior notice that Morgan would be refused access to an alternative education program during her expulsion, and the Swindles were not afforded a hearing in connection with that deprivation of continued public educational benefits for Morgan, either before or after their requests were not granted.

Louisiana Revised Statutes §17:416.2(A)(1) provides: "Any student suspended or expelled from school pursuant to the provisions of R.S. 17:416," subject to certain exceptions, "shall remain under the supervision of the governing authority of the city, parish, or other local public school system taking such action using alternative education programs for suspended and expelled students approved by the State Board of Elementary and Secondary Education . . . ." But "[a]ny city, parish, or other local school system unable to comply with the provisions of Subsection A of this Section for economically justifiable reasons as defined by the State Board of Elementary and Secondary Education may apply to the board on a school year to school year basis for a waiver from the requirements of these provisions." La. Rev. Stat. Ann. § 17:416.2(B)(1). However, effective with the 2008-2009 school year, such waivers are prohibited. La. Rev. Stat. Ann. § 17:416.2(B)(3).

Pope and the other defendants acknowledge that at the time the Swindles requested and were refused alternative education for Morgan, no "waiver had . . . been sought [by the LPSB] for that particular school year [2005-2006]." Pope Br. 8. They emphasize that the LPSB had obtained waivers from providing its

No. 08-31249

students alternative education from 1995 to 2004. Nonetheless, according to a letter from the LPSB to the BESE, it was not until March 10, 2006, almost four months after the LPSB had terminated all public educational benefits for Morgan, that the LPSB petitioned the DOE for a waiver of the LPSB's obligation to provide public school children alternative education for the 2005-2006 school year. Insofar as the record discloses, before Defendants rejected the Swindles' requests that Morgan receive alternative education, neither the LPSB, Pope, nor the other defendants notified the Swindles or Morgan that the LPSB intended to apply for such a waiver. Thus, the Swindles and Morgan were not given any kind of notice, hearing or process in connection with the LPSB's denial of public education benefits to Morgan through an alternative education program or otherwise.

Without access to continuing public educational benefits, the Swindles endeavored to home-school Morgan for the rest of the 2005-2006 school year. They then petitioned the LPSB to have Morgan readmitted to Doyle High School at the start of the 2006-2007 school year.[3] The LPSB and Pope agreed, but required that Morgan reenter as an eighth grader and repeat her eighth grade classwork, refusing to allow her readmission to the ninth grade along with her former classmates.

---

[3] "Plaintiffs then sought to have Morgan take the [Louisiana Education Assessment Program ('LEAP')] test. The School Board initially refused to administer the test to Morgan. Plaintiffs brought suit in the 21st Judicial District Court of Louisiana and received injunctive relief mandating that Morgan be allowed to take the test. Morgan took the LEAP test and passed, scoring at the achievement level of 'mastery' in English and 'basic' in Mathematics. Despite Morgan's scores on the LEAP and her home schooling, the LPSB declined to promote Morgan to the ninth grade upon her return to Doyle High School. After further litigation in state court, the school system was ordered to consider Morgan's home school work and determine whether Morgan should be advanced to the next grade. LPSB evaluated Morgan and decided that she should not be advanced because she was 11 days short of the attendance requirement and had failed the math portion of another placement test administered by the School Board." *Swindle v. Livingston Parish Sch. Bd.*, No. 06-837-JJB, 2008 WL 5157727, at *1 (M.D. La. Dec. 9, 2008) (unpublished) (footnotes omitted).

No. 08-31249

In June 2006, the Swindles filed suit in state court seeking injunctive relief against Defendants related to Morgan's readmission to Doyle High School. *B.W.S., Jr. v. Livingston Parish Sch. Bd.*, 960 So. 2d 997, 998 (La. Ct. App. 1st Cir. 2007). On February 15, 2007, the Louisiana trial court denied the Swindles' request for injunctive relief. *Id.* at 1001. Plaintiffs appealed from that judgment to the Louisiana Court of Appeal for the First Circuit, but that court, on April 4, 2007, found that their case was moot, as "the remedy of allowing the child to attend the ninth grade at this late date provides her with no relief as there are [now] less than 65 days left in the school year." *Id.* at 1002.

On October 30, 2006, Plaintiffs filed this federal suit for damages under 42 U.S.C. § 1983 on Morgan's behalf in the United States District Court for the Middle District of Louisiana. The Swindles alleged that Defendants violated Morgan's procedural and substantive due process rights and her right to equal protection of the laws. In the district court, as part of their answers to the complaint and motions for summary judgment, Defendants raised the defenses of sovereign immunity, res judicata, and qualified immunity.

The district court granted summary judgment for Defendants dismissing all of Plaintiffs' claims, concluding that Plaintiffs had failed to adduce evidence on which a reasonable trier of fact could conclude that Defendants perpetrated "any constitutional violations upon which a § 1983 claim could be based." *Swindle v. Livingston Parish Sch. Bd.*, No. 06-837-JJB, 2008 WL 5157727, at *5 (M.D. La. Dec. 9, 2008) (unpublished). The district court did not reach any of the affirmative defenses raised by Defendants.[4] Plaintiffs timely appealed.

---

[4] In a footnote, which Westlaw has not reprinted in full, the district court acknowledged that the State Superintendent of Education, the Louisiana Department of Education, and the State Board of Elementary and Secondary Education would likely be entitled to sovereign immunity from suit and that Pope would likely be entitled to qualified immunity. However, it rested its judgment on the basis that Plaintiffs had failed to establish their claims.

No. 08-31249

## STANDARD OF REVIEW

"In determining whether a district court properly granted summary judgment, this Court must review the record under the same standards that guided the district court." *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992). "We must review the evidence, as well as the inferences that may be drawn from the evidence, in the light most favorable to the party that opposed the motion for summary judgment." *Id.* "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[5] Summary judgment is required against a party who, "after adequate time for discovery[,] . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Conversely, "[i]f the evidence would permit a reasonable trier of fact to find for the non-moving party, then summary judgment should not be granted." *Anaya v. Traylor Bros., Inc.*, 478 F.3d 251, 253 (5th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

## DISCUSSION

Except for its dismissal of Plaintiffs' procedural due process claim regarding the denial of Morgan's request for alternative education, we see no error in the district court's judgment. Moreover, Plaintiffs have waived all of their other claims by failing to adequately brief and argue them on appeal.[6]

---

[5] While this case was pending before this court, the text of Rule 56 changed. This change was meant to "carr[y] forward the summary-judgment standard expressed in former subdivision (c)." Fed. R. Civ. P. 56 advisory committee note (2010 Amendments). Thus, while the district court's decision and our decision rely on slightly different language, both represent the same legal standard.

[6] The Federal Rules of Appellate Procedure require an appellant to present in his brief his "contentions and reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(9)(A). "A litigant's failure to provide legal

No. 08-31249

**I.**

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Defendants do not contend that procedural due process is totally inapplicable to terminations of a public school student's public education benefits. On the contrary, they and the district court recognize that Louisiana's statutes create a "property interest" protected by the Due Process Clause of the Fourteenth Amendment in a public school child and her parents receiving such benefits. *Swindle*, 2008 WL 5157727, at *2 (citing *Goss v. Lopez*, 419 U.S. 565, 574 (1975)). They acknowledge that this protected property interest cannot "be taken away for [the student's] misconduct without adherence to the minimum procedures required by th[e Due Process] Clause." *Id.* (quoting *Goss*, 419 U.S. at 574). The district court also recognized that the state statutes "may potentially give rise to a property interest in alternative education" and that "[i]f such a property interest does exist, then Morgan would indeed be entitled to due process before being denied alternative education." *Id.* at *3.

Nevertheless, the district court concluded that Morgan had no protected property interest in alternative education because the state statute allows a local school system to annually apply for and obtain from the BESE, "for economically justifiable reasons," a waiver of its obligation to provide alternate education. *Id.* (quoting La. Rev. Stat. Ann. § 17:416.2(B)(1)) (internal quotation marks omitted). It had been the LPSB's "pattern and practice" in previous school years

---

or factual analysis results in waiver." *Nw. Enters. Inc. v. City of Houston*, 352 F.3d 162, 183 n.24 (5th Cir. 2003); *see also Turner v. Quarterman*, 481 F.3d 292, 295 n.1 (5th Cir. 2007) (stating that the court will not "consider issues that are not adequately briefed" in the appellant's brief, even if the appellant attempts to incorporate by reference arguments made elsewhere).

to obtain such a waiver. *Id.* Although the LPSB did not obtain a waiver for the 2005-2006 school year prior to Morgan's expulsion on November 14, 2005 and her parents' request that she receive alternative education, the LPSB belatedly obtained such a waiver for the 2005-2006 school year in April 2006. Thus, the district court concluded that Morgan and her parents did not have a constitutionally protected expectation in receiving alternative education in Livingston Parish. *Id.* As for Plaintiffs' arguments that the waiver could not retroactively defeat Morgan's property right to alternative education benefits and that the waiver had been granted illegally, the district court declined to find one way or another because "Plaintiffs cite no case law or statute for the proposition that the Board's waiver was illegally granted." *Id.*

We cannot agree with the district court's analysis in this respect. Morgan's constitutional claim that she was entitled to procedural due process before she was refused access to alternative education is entirely distinct from and collateral to her substantive claim of entitlement under state law to continued education through an alternative education program. *See Mathews v. Eldridge*, 424 U.S. 319, 330-31 (1976). Morgan claims that she was entitled to pre-deprivation notice and some kind of hearing, before a possibly erroneous termination of her right to alternative education caused her to lose her right to education entirely for the 2005-2006 school year and suffer irreparable damage. When we analyze her constitutional claim of procedural due process as a separate entitlement to protect against the erroneous or wrongful deprivation of her claim to continued public education, we conclude that she was entitled to some kind of notice and hearing, either prior to or soon after she was deprived of her right to continued education, and that in this case she was afforded neither. Therefore, based upon the record before us, we conclude that neither Pope nor the LPSB were entitled to summary judgment on this claim.

No. 08-31249

## A.

In *Goss v. Lopez*, 419 U.S. 565 (1975), the Supreme Court held that a student has a property interest in continued receipt of an education when the state creates a public school system and requires children to attend. The Court explained that two Ohio statutes "direct[ed] local authorities to provide education to all residents between five and 21 years of age, and a compulsory-attendance law require[d] attendance for a school year of not less than 32 weeks." *Id.* at 573. Therefore, "on the basis of state law, appellees plainly had legitimate claims of entitlement to a public education." *Id.* Put another way, although the state "may not be constitutionally obligated to establish and maintain a public school system, [Ohio] has nevertheless done so and has required its children to attend." *Id.* at 574. The Court emphasized the consequence of public education, calling it "'perhaps the most important function of state and local governments.'" *Id.* at 576 (quoting *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954)). The Court determined that the state laws also created a liberty interest in not being stigmatized by suspension. *Id.* at 574 ("The Due Process Clause also forbids arbitrary deprivations of liberty. 'Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,' the minimal requirements of the Clause must be satisfied." (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)). "The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted." *Id.* (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943)) (internal quotation marks omitted).

This court has consistently held that a student who is removed from her regular public school, but is given access to an alternative education program, has not been denied her entitlement to public education. *See Harris ex rel. Harris v. Pontotoc Cnty. Sch. Dist.*, 635 F.3d 685, 690 (5th Cir. 2011); *Nevares*

No. 08-31249

*v. San Marcos Consol. Indep. Sch. Dist.*, 111 F.3d 25, 26 (5th Cir. 1997). This rule is consistent with *Goss*'s directive that, where state law creates an entitlement to public education, it is a student's "*total exclusion from the educational process* for more than a trivial period" that constitutes a deprivation of protected property and liberty interests subject to due process constraints. *Goss*, 419 U.S. at 576 (emphasis added). Accordingly, we have explained that "a student's transfer [from her regular school] to an alternative education program does not *deny access to public education*, and *therefore* does not violate the Fourteenth Amendment interest." *Harris*, 635 F.3d at 690 (emphasis added) (citing *Nevares*, 111 F.3d at 26-27); *Nevares*, 111 F.3d at 26 (concluding that a student removed from his regular school for disciplinary reasons and reassigned to an alternative education program was "not . . . denied access to public education, even temporarily"); *see also Riggan v. Midland Indep. Sch. Dist.*, 86 F. Supp. 2d 647, 655 (W.D. Tex. 2007) (recognizing that "[t]he [*Nevares*] Court found that a constitutional issue was not raised because the plaintiff was never denied access to public education," and that "[*Nevares*] reinforces the basic idea that protected property rights are affected and due process protections are required when the discipline imposed amounts to a deprivation of access to education"). In other words, such a reassignment does not amount to a "total exclusion from the educational process." *See Goss*, 419 U.S. at 576; *McCall v. Bossier Parish Sch. Bd.*, 785 So. 2d 57, 66 (La. App. 2d Cir. 2001) ("[T]he expulsions in this case . . . were made with an assignment to [an] alternative school. Because this is not an expulsion in the traditional sense causing total deprivation of education, the U.S. Fifth Circuit Court of Appeals has indicated that no protected property interest is implicated for purposes of due process analysis in a school's expulsion and assignment of a student to an alternative school.") (citations omitted); *Stafford Mun. Sch. Dist. v. L.P.*, 64 S.W.3d 559, 563 (Tex. App. 2001) ("[H]ere, as in *Nevares*, [a student reassigned to an alternative

13

education program] was not excluded from the educational process . . . [and so] the transfer . . . did not involve a property or liberty interest."). It follows clearly and inexorably from these decisions that when a child is denied the right to alternative education provided her by state law, resulting in her "total exclusion from the educational process[,] . . . [n]either the property interest in educational benefits . . . denied nor the liberty interest in reputation, which is also implicated, is so insubstantial that [such deprivation] may constitutionally be imposed by any procedure the school chooses, no matter how arbitrary," *Goss*, 419 U.S. at 576.

Consistent with these cases, and contrary to the conclusion of the district court, we conclude that Louisiana's statutory scheme provided Morgan an entitlement to receive alternative education during her expulsion, i.e., Morgan had a property interest in continued alternative education of which she could not be deprived without due process. The importance of public education to students and the public, upon which the Supreme Court remarked in *Goss, id.*, does not cease upon a student's suspension or expulsion. Recognizing this, Louisiana's statutes provide, as a general rule, that when a child is suspended or expelled, she is not automatically deprived of all further public educational benefits. Rather, in the main, the student "shall remain under the supervision of the governing authority of the city, parish, or other local public school system taking such action using alternative education programs . . . ." La. Rev. Stat. Ann. §17:416.2(A)(1); *see also McCall*, 785 So. 2d at 58 n.1 ("An expulsion includes the removal of the student from all regular school settings for a period of not less than one school semester, during which time the school board shall place the pupil in an alternative school." (citing La. Rev. Stat. § 17:416(A)(2)(c))). Only certain categories of expelled students are statutorily ineligible for such programs, such that they may be excluded from public education altogether, La. Rev. Stat. Ann. §§ 17:416.2(A)(1), 17:416(B) & (C)(2), and it has not been shown

for purposes of summary judgment that Morgan falls within such a class of expellees.[7] The statutes also allow the school board to apply for a waiver from its obligation to provide alternative education programs. *See* La. Rev. Stat. § 17:416.2(B) (stating that "[a]ny . . . local school system unable to comply with [§ 17:416.2(A)(1), the alternative education program requirements] for economically justifiable reasons . . . may apply to the [BESE] on a school year to school year basis for a waiver from the requirements . . .."). However, the statute provides that a board may only do so on a "school year to school year" basis. *Id.* Consequently, we believe that the LPSB's failure to apply for and obtain such a waiver prior to the start of the 2005-2006 school year raised reasonable expectations that, in general, under state law, expelled students would continue under the LPSB's supervision and continue to receive alternative education during that school year. It was not until March 2006—four months after Morgan was expelled and the LPSB refused to provide Morgan alternative education—that the LPSB applied for a waiver from the BESE. Accordingly, when Morgan's parents applied for her entry into an alternative education program, she had such a right recognized and protected by state law. We see nothing in Louisiana law that allows for the retrospective alteration or deprivation of an expelled student's right to alternative education, and we are

---

[7] Defendants contend that Morgan's misconduct places her in one of these exceptions, *viz.*, that she was a student expelled for possession of marijuana on school property or at a school event, *see* La. Rev. Stat. Ann. § 17:416(C)(2)(b)(ii). However, the summary judgment record does not indicate that Defendants have introduced any evidence demonstrating that Morgan was ever charged with, or determined to be guilty of, such conduct, as defined under Louisiana law. *See State v. Proctor*, 901 So. 2d 477, 482 (La. Ct. App. 5th Cir. 2005) (explaining that "[m]ere presence in an area where drugs are found or mere association with the person in actual possession does not constitute constructive possession"); *McCall*, 785 So. 2d at 59, 67 (concluding that "possession of a [controlled dangerous substance on school grounds] . . . did not occur" when students "acknowledged they left school without authorization, smoked what they believed was marijuana [and what the court assumed was a controlled dangerous substance, of which they were under the influence] and immediately returned to school where they were apprehended in a parking lot by a school official").

not persuaded that such action can be used to retroactively defeat or circumvent a student's right to due process when she is deprived of her state law right to continued public alternative education. Therefore, because the Louisiana statutes directed that a student such as Morgan be provided alternative education, rather than excluded from public education entirely, we conclude that she was entitled to the procedural protections provided by the Due Process Clause before she could be deprived of alternative education.[8]

Our analysis is confirmed by the Supreme Court's decision in *Paul v. Davis*, 424 U.S. 693 (1976). There the Court explained:

> It is apparent from our decisions that there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either "liberty" or "property" as meant in the Due Process Clause. These interests attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law, and we have repeatedly ruled that the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status. In *Bell v. Burson*, 402 U.S. 535 (1971), for example, the State by issuing drivers' licenses recognized in its citizens a right to operate a vehicle on the highways of the State. The Court held that the State could not withdraw this right without giving petitioner due process. In *Morrissey v. Brewer*, 408 U.S. 471 (1972), the State afforded

---

[8] To be clear, we do not hold that there is a generalized constitutional right to alternative education programming for expelled students. As explained in *Goss*, "interests in property [protected by the Due Process Clause] are normally 'not created by the Constitution. Rather, they are created and their dimensions are defined' by an independent source such as state statutes or rules entitling the citizen to certain benefits." *Goss*, 419 U.S. at 572-73. We merely reaffirm *Goss*'s conclusion that where, as "[h]ere, on the basis of state law, [a student] plainly had [a] legitimate claim[] of entitlement to a public education . . . the State is constrained to recognize [that entitlement] as a property interest which is protected by the Due Process Clause and which may not be taken away . . . without adherence to the minimum procedures required by that Clause." *Id.* at 573-74. In this case, Louisiana law created and defined the parameters of such a protected property interest by mandating that, subject to certain narrow exceptions, local education authorities must provide students expelled from their regular schools with public education in the form of alternative education programs, rather than being relieved of the obligation to provide public education altogether. Under *Goss*, this entitlement is protected by the requirements of due process.

parolees the right to remain at liberty as long as the conditions of their parole were not violated. Before the State could alter the status of a parolee because of alleged violations of these conditions, we held that the Fourteenth Amendment's guarantee of due process of law required certain procedural safeguards.

In each of these cases, as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished. It was this alteration, officially removing the interest from the recognition and protection previously afforded by the State, which we found sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment.

*Id.* at 710-711 (footnote omitted). Just as in *Bell* and *Morrissey*, as a result of the state action by the LPSB, Pope, and the BESE, a right or status previously recognized by state law and vested in Morgan was distinctly altered or extinguished. This alteration, officially removing Morgan's interest from the recognition and protection previously afforded by the state, was sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment.

**B.**

"Once it is determined that due process applies, the question remains what process is due." *Goss*, 419 U.S. at 577 (quoting *Morrissey v. Brewer*, 408 U.S. at 481) (internal quotation marks omitted). "The student's interest is to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences." *Id.* at 579. "Disciplinarians, although proceeding in utmost good faith, frequently act on the reports and advice of others; and the controlling facts and the nature of the conduct under challenge are often disputed. The risk of error is not at all trivial . . . ." *Id.* at 580. On the other hand, "[t]he difficulty is that our schools are vast and complex. Some modicum of discipline and order is essential if the educational function is to be performed." *Id.* As a result, the court held that "[a]t the very minimum, . . . students facing

suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing." *Id.* at 579. The Court said that for a suspension of ten days or less, the student must be provided "oral or written notice of the charges" and "an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581. But the Court indicated that more formal proceedings might be required in cases involving longer suspensions or expulsions. *Id.* at 584 ("We should also make it clear that we have addressed ourselves solely to the short suspension, not exceeding 10 days. Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures. Nor do we put aside the possibility that in unusual situations, although involving only a short suspension, something more than the rudimentary procedures will be required.").

As the Court explained in *Mathews*, "[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests[,] . . . 'flexibl[y] . . . call[ing] for such procedural protections as the particular situation demands.'" 424 U.S. at 332, 334 (quoting *Morrissey*, 408 U.S. at 481). "Accordingly, resolution of the issue whether the . . . procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected." *Id.* at 334 (citing *Arnett v. Kennedy*, 416 U.S. 134, 167-68 (1974) (Powell, J., concurring in part); *Goldberg v. Kelly*, 397 U.S. 254, 263-66 (1970); *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)). "More precisely, [the Court's] prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's

interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 334-35 (citing *Goldberg*, 397 U.S. at 263-71).

Here, the private interest—Morgan's ability to continue her public education, without the delay, damage and stigma of being forced to repeat the eighth grade—is immense. As the Court stated in *Goss* and has continued to reiterate, "'[e]ducation is perhaps the most important function of state and local governments.'" *Franchise Tax Bd. v. Hyatt*, 538 U.S. 488, 499 (2003) (quoting *Brown*, 347 U.S. at 493); *New Jersey v. T.L.O.*, 469 U.S. 325, 353 (1985) (Blackmun, J., concurring in the judgment) (same); *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 490 (1979) (Rehnquist, J., dissenting, joined by Powell, J.) (same); *Goss*, 419 U.S. at 576 (same). Public education has also been described as "a most vital civic institution for the preservation of a democratic system of government." *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 230 (1963) (Brennan, J., concurring). Accordingly, the Court's cases have "consistently recognized the importance of education to the professional and personal development of the individual." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 437 (1992) (Blackmun, J., concurring) (citing *Brown*, 347 U.S. at 493). Moreover, it cannot be denied that "[i]ncreasing global competition also has made primary and secondary education economically [even] more important." *United States v. Lopez*, 514 U.S. 549, 621 (1995) (Breyer, J., dissenting, joined by Stevens, Souter, and Ginsburg, JJ.).

Further, as the Court also recognized in *Goss*, 419 U.S. at 580, and as the facts of this case demonstrate, the risk of an erroneous deprivation through the lack of procedures used by the LPSB is significant. Although the Swindles were never provided notice or a hearing regarding why Morgan was denied alternative education, in this appeal Defendants take the position that it was because Morgan possessed drugs on school grounds or at a school event. Yet, the

No. 08-31249

summary judgment evidence supports the opposite conclusion: Morgan was not accused of or expelled for possession of marijuana on school property or at the school event. Instead, she was accused of and expelled for "any other serious offense." Therefore, the facts of this case reveal that absent procedures to protect against secret determinations and post hoc rationalizations, the opportunity for error is great. *See Freeman v. City of Dallas*, 186 F.3d 601, 607 (5th Cir. 1999) ("Non-disclosure by the government poses the risk of an erroneous deprivation because it forecloses the individual from testing the accuracy of the government's evidence.").

The probable value of even minimal procedural safeguards in this case is clear and undisputable. Had the Swindles been provided any notice and an opportunity to be heard regarding the denial of Morgan's right to alternative education, it appears likely that they could have demonstrated that Morgan did not fall within the category of expellees disqualified for alternative education. What is more, they could have disputed Pope's erroneous claim that LPSB had applied for or received from the BESE a waiver from the state law requirement that it provide Morgan alternative education for the 2005-2006 school year. Had this notice and some kind of a hearing occurred before, or at a reasonable time after, the deprivation of her alternative education, Morgan might have avoided most of the consequences of what appears on this record to have been a mistaken decision. *See Mathews*, 424 U.S. at 331 (noting that pre-deprivation process is particularly appropriate where "full relief cannot be obtained at a postdeprivation hearing" (citing *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 156 (1974)); *see also Cuellar v. Tex. Emp't Comm'n*, 825 F.2d 930, 934 (5th Cir. 1987) (noting the benefit provided by holding "'some kind of a hearing' [in order to] ensur[e] an effective 'initial check against mistaken decisions'" (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985))).

No. 08-31249

Finally, providing the Swindles with a minimal notice and hearing safeguard would not have adversely affected Defendants' interests. *See Mathews*, 434 U.S. at 335. The cost of providing notice that explains the basis for the denial, and some form of hearing before an administrator, is extraordinarily low. We are speaking only of administrators performing their normal functions of communicating with parents and students. Therefore, as in *Goss*, we conclude that Morgan was, *at a minimum*, entitled to *some kind of* notice and hearing before the LPSB deprived her of alternative education. *See Goss*, 419 U.S. at 579. "The ultimate balance involves a determination as to when, under our constitutional system, . . . procedures must be imposed upon administrative action to assure fairness." *Mathews*, 424 U.S. at 348. This case starkly demonstrates that absent fair procedures, a student can be mistakenly denied the right to public education for most of a school year and unnecessarily made to repeat the same grade. On the record before us, Morgan was provided neither due process notice nor an opportunity to be heard regarding the denial of her right to alternative education. Therefore, it is clear that Pope and the LPSB are not entitled to summary judgment on this claim.

## II.

As we can affirm summary judgment on any available ground, because we have concluded that a reasonable trier of fact could find in Plaintiffs' favor on one claim, we now examine Defendants' claimed defenses to suit.

## A.

The State Superintendent of Education, sued in his official capacity, the DOE and the BESE, argue that they are immune from the suit because they are entitled to sovereign immunity. We agree. "[T]he Constitution does not provide for federal jurisdiction over suits [for money damages] against nonconsenting States." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000). Sovereign immunity also extends to state officials sued in their official capacity for monetary relief.

No. 08-31249

*See id.*; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent . . . ."). At oral argument, Plaintiffs disclaimed that they had any claims for equitable relief against the Superintendent or the state agencies. They solely sought money damages for past constitutional violations. Therefore, we must affirm the grant of summary judgment in favor of those defendants on the basis that they are entitled to sovereign immunity from suit.

**B.**

The LPSB argues that we should conclude that Plaintiffs' claims against it are barred by res judicata. It argues that the state trial court's February 15, 2007 judgment represents a final judgment on the merits that has preclusive effect against all claims not raised in that proceeding, including the claims herein. We disagree. Res judicata requires that there have been a "prior action [that] was concluded by a final judgment on the merits." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005). We look to state law to determine whether a prior state court judgment was final. *See Blanchard 1986, Ltd. v. Park Plantation, LLC*, 553 F.3d 405, 407 n.8 (5th Cir. 2008). Louisiana law provides that it would "be quite incongruous to declare an entire suit moot and yet give [r]es judicata effect to a district court judgment in the moot proceeding." *Randle v. Gallagher*, 169 So. 2d 224, 226 (La. Ct. App. 4th Cir. 1964). Applying this principle, a Louisiana Court of Appeal held that a trial court's judgment, in a case in which a married plaintiff sought a separation and obtained an alimony award, was not a final judgment that would have "[r]es judicata effect" on subsequent alimony determinations. *Id*. While the original case "was pending [before the state supreme court], defendant obtained a divorce," and thus the trial court's alimony award became moot. *Id*. at 225. Mootness rendered the original trial court judgment not a final judgment, even

though the Louisiana Supreme Court had denied motions to dismiss that suit, leaving intact "the judgment of the lower court," including the alimony award. *Id.* at 226; *see also Randle v. Randle*, 119 So. 2d 495 (La. 1960) (the Louisiana Supreme Court decision); *Randle v. Randle*, 144 So. 2d 461 (La. Ct. App. 4th Cir. 1962) (the Louisiana Court of Appeal decision affirming the alimony award).

The facts of *Randle* are analogous to what occurred in this case. The February 15 judgment of the state trial court "denied [a] mandatory injunction" that Plaintiffs sought against the LPSB. *B.W.S., Jr. v. Livingston Parish Sch. Bd.*, 960 So. 2d 997, 1001 (La. Ct. App. 1st Cir. 2007). Plaintiffs appealed that judgment and the state appellate court denied the writ because "the remedy of allowing the child to attend the ninth grade at this late date provides her with no relief." *Id.* at 1002. In other words, the case was held to be moot. Therefore, under Louisiana law, the judgment of the trial court is not a final judgment that has a preclusive effect against claims not raised in that proceeding.

## C.

Finally, Superintendent Pope re-urges his motion for qualified immunity, which the district court did not specifically rule on in its opinion granting summary judgment. To defeat a claim of qualified immunity, a plaintiff must demonstrate both that the right the defendant was alleged to have violated was "clearly established," and that the defendant acted "unreasonably" in light of that clearly established law. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) ("Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law. . . . [In addition,] a plaintiff must allege facts sufficient to demonstrate that no reasonable officer could have believed his actions were proper."). "Whether an asserted federal right was clearly established at a particular time, so that a public official who allegedly violated the right has no qualified immunity from

suit, presents a question of law, not one of 'legal facts.'" *Elder v. Holloway*, 510 U.S. 510, 516 (1994) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "That question of law, like the generality of such questions, must be resolved *de novo* on appeal." *Id.* (citing *Pierce v. Underwood*, 487 U.S. 552, 558 (1988)). "A court engaging in review of a qualified immunity judgment should therefore use its 'full knowledge of its own [and other relevant] precedents.'" *Id.* (alteration in original) (quoting *Davis v. Scherer*, 468 U.S. 183, 192 n.9 (1984)). "The touchstone of th[e] inquiry" into whether an official's conduct was unreasonable in light of clearly established law "is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000). In other words, we perform an objective analysis of the reasonableness of the official's conduct in light of the circumstances and are forbidden from considering the official's "subjective state of mind." *Thompson v. Upshur Cnty., Tex.,* 245 F.3d 447, 457 (5th Cir. 2005).

As we have already explained, it has been clear since *Goss* that when state law directs local authorities to provide public education, a student's "total exclusion from the educational process" must be accompanied by the procedural protections required by the Due Process Clause. *E.g.*, *Goss*, 419 U.S. at 576. In *Nevares* and *Harris*, this court made clear that no deprivation of the liberty and property interests associated with public education occurs when a student is removed from her regular school environment and transferred to an alternative education program. *Harris*, 635 F.3d at 690; *Nevares*, 111 F.3d at 26. In a disciplinary alternative education model like those in *Nevares* in *Harris*—and like the Louisiana statutory scheme at issue here[9]—a student's expulsion from

---

[9] As explained above, only particular categories of expelled students can be denied alternative education under Louisiana's scheme. *See* La. Rev. Stat. Ann. §§ 17:416.2(A)(1),

No. 08-31249

her regular school does not deny her access to the educational process, because she continues to receive a public education in the form of alternative programming. *E.g.*, *McCall*, 785 So. 2d at 66 (In Louisiana, "expulsion[] . . . made with an assignment to an alternative school . . . is not an expulsion in the traditional sense causing total deprivation of education . . . ." (citing *Nevares*, 111 F.3d 25)). Under these decisions, a constitutionally relevant deprivation occurs when an official denies a student access to alternative education to which she has an entitlement based on state law; it is by that action that the official "total[ly] exclud[es]" the student from public education, *Goss*, 419 U.S. at 576. We conclude that these "precedents  . . . placed . . . beyond debate," *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2083 (2011), the question of whether procedural due process safeguards had to be complied with in connection with Pope's refusal to permit Morgan access to alternative education.

With respect to the process due, this court held in *Meyer v. Austin Independent School District* that it was clearly established that before students could be deprived of their right to education they must be afforded the opportunity "to tell their side of the story." 161 F.3d 271, 275 (5th Cir. 1998). "Reasonable public officials . . . could not differ on whether allowing the students to tell their side of the story was required." *Id.* "While [a principal] was free to suspend the students after hearing their stories, *Goss* unambiguously required him to allow them to present those stories, and if [the principal] did not do so, he violated the students' due process rights." *Id.*; *see also Tex. Faculty Ass'n v. Univ. of Tex.*, 946 F.2d 379, 385-86 (5th Cir. 1991) ("In *Goss*, [419 U.S. at 583,] the Court held that students are entitled to a due process hearing before being suspended from school for nonacademic reasons because 'effective notice and an informal hearing . . . will provide a meaningful hedge against erroneous action.'"

17:416(B) & (C)(2).

No. 08-31249

(omission in original)). The Louisiana statutes direct school boards both to provide public education generally and, connected with that right, to provide suspended and expelled students alternative education, unless a specific statutory exception applies. The summary judgment record indicates that Morgan fell within the class of people protected by both statutes. She was provided no notice or hearing when her parents' request that she receive alternative education was not granted.

Pope implies that his conduct was objectively reasonable because he did not know that the school system had failed to obtain a waiver from the BESE relieving it of its obligation to provide alternative education in the 2005-2006 school year.[10] What is at issue here, however, is not whether Pope was reasonable in believing that to be the case. While Pope was free to deny the Swindles' petition for Morgan to receive alternative education after hearing the Swindles' story, *Goss* and its progeny unambiguously required him to allow them to present their stories and their side of the case. *See Meyer,* 161 F.3d 271. If he

---

[10] To the extent that Pope suggests that he also believed that Morgan's alleged conduct exempted the school board from its duty to provide her alternative education, *see* La. Rev. Stat. Ann. § 17:416.2(A)(1), this belief was contrary to clear Louisiana law. *See id.* § 17:416(C)(2)(b)(ii); *Proctor*, 901 So. 2d 482; *McCall*, 785 So. 2d at 67. Moreover, the reasonableness of this purported belief is irrelevant to our qualified immunity inquiry regarding Plaintiffs' procedural due process claim. Regardless of whether Pope correctly thought that there was a basis for denying Morgan alternative education, he was still obligated to give her notice and an opportunity to be heard. Here, Pope did not give Morgan or her parents notice that Morgan was charged with an offense that could result in denial of alternative education; rather, she was charged with "any other serious offense." *See Goss*, 419 U.S. at 581 ("[D]ue process requires . . . that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to tell his side of the story. . . . [I]n being given an opportunity to explain his version of the facts at this discussion, the student first must be told what he is accused of doing and what the basis of the accusation is."); *Harris*, 635 F.3d at 691 ("We must first be clear as to the basis for [the student's] suspension. . . . The truth of th[e] charges is not the question in evaluating whether *Goss* has been satisfied. Instead, the issue is whether [the student] was adequately informed of the specific charges from which the suspension derived, and whether he was given 'an opportunity to tell his side of the story.'" (quoting *Goss*, 419 U.S. at 581)).

did not do so, as the summary judgment record strongly indicates, then he violated Morgan's procedural due process rights. *See id.*

Accordingly, Pope is not entitled to summary judgment based on his claim of qualified immunity, although he is still entitled to raise the defense of qualified immunity at trial.

## **CONCLUSION**

For these reasons, we AFFIRM the district court's summary judgment in principal part, but we REVERSE the summary judgment in respect to Plaintiffs' claims that Morgan was deprived of her constitutional right to procedural due process when Defendants denied her right under state law to continued public educational benefits through an alternative education program without some kind of notice and some kind of hearing. We REMAND the case to the district court for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.